**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

               :

IN RE:                :    **Chapter 11**

               :

**ALMATIS B.V.,** *et al.,*[1]    :    **Case No. _____**

               :

      **Debtors.**        :    **Joint Administration Requested**

               :

-----------------------------------------------------------x

## NOTICE OF FILING OF PLAN OF REORGANIZATION

       **PLEASE TAKE NOTICE** that the Debtors hereby file their *Joint Prepackaged Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* (the "***Plan***") pursuant to section 1126(b) of the Bankruptcy Code.  A copy of the Plan is annexed hereto as ***Exhibit 1***.  Copies of the Plan may be obtained upon request of Debtors' counsel at the address specified below and may be inspected (i) at the office of the Clerk of the Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, (ii) on the Bankruptcy Court's internet site at www.nysb.uscourts.gov, and/or (iii) on the internet site established by the Debtors' notice and claims agent, Epiq Bankruptcy Solutions, LLC, at http://chapter11.epiqsystems.com/almatis.

Dated:   New York, New York
         April 30, 2010

                      Respectfully submitted,

                      /s/ Michael A. Rosenthal
                      Michael A. Rosenthal (MR-7006)
                      Janet M. Weiss (JW-5460)
                      Matthew K. Kelsey (MK-3137)
                      **GIBSON, DUNN & CRUTCHER LLP**
                      200 Park Avenue
                      New York, New York  10166-0193
                      Telephone:  (212) 351-4000
                      Facsimile:  (212) 351-4035

                      PROPOSED ATTORNEYS FOR THE DEBTORS AND
                      DEBTORS IN POSSESSION

---

[1]  The following entities affiliated with Almatis B.V. also commenced chapter 11 cases contemporaneously with it:  DIC Almatis Holdco B.V., DIC Almatis Midco B.V., DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., Almatis Holdings 9 B.V., Almatis Holdings 7 B.V., Almatis US Holdings, Inc., Almatis, Inc., Almatis Asset Holdings LLC, Blitz F07-neunhundertsechzig-drei GmbH, Almatis Holdings GmbH, and Almatis GmbH.  The Plan does not apply to DIC Almatis Holdco B.V. or DIC Almatis Midco B.V.

# Exhibit 1

# Plan of Reorganization

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Janet M. Weiss (JW-5460)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York  10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Proposed Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| | : |
| | : Chapter 11 |
| | : |
| **IN RE:** | : Case No. _____ |
| | : |
| **ALMATIS B.V.**, *et al.*, | : Jointly Administered |
| | : |
| **Debtors.** | : |
| | : |
| | x |

-------------------------------------------------------------

### JOINT PREPACKAGED PLAN OF REORGANIZATION FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:  New York, New York
         April 23, 2010

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................1

## I. DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME ..........................1

**1.1.** DEFINITIONS.................................................................................................................................1
**1.2.** RULES OF CONSTRUCTION.............................................................................................................1
**1.3.** COMPUTATION OF TIME.................................................................................................................2

## II. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIMS AGAINST THE DEBTORS..................................................2

**2.1.** ADMINISTRATIVE EXPENSE CLAIMS.............................................................................................2
**2.2.** PROFESSIONAL COMPENSATION CLAIMS.......................................................................................2
**2.3.** PRIORITY TAX CLAIMS..................................................................................................................3
**2.4.** DIP FACILITY CLAIMS...................................................................................................................3
**2.5.** U.S. TRUSTEE FEES.......................................................................................................................3

## III. CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN DEBTORS ..........................................3

**3.1.** CLASSIFICATION OF CLAIMS.........................................................................................................3
**3.2.** CLASSES.......................................................................................................................................3
    *3.2.1. Classes 1(a)-(k): Other Priority Claims.*.................................................................................3
    *3.2.2. Classes 2(a)-(k): Senior Lender Claims.*.................................................................................4
    *3.2.3. Classes 3(a)-(k): Second Lien Claims.*...................................................................................5
    *3.2.4. Classes 4(a)-(k): Mezzanine Claims.*.....................................................................................6
    *3.2.5. Classes 5(a)-(d): Junior Mezzanine Claims.*..........................................................................7
    *3.2.6. Classes 6(a)-(k): Other Secured Claims.*...............................................................................7
    *3.2.7. Classes 7(a)-(k): General Unsecured Claims.*........................................................................8
    *3.2.8. Classes 8(a)-(k): Intercompany Claims.*................................................................................9
    *3.2.9. Classes 9(a)-(k): Subordinated Claims.*.................................................................................9
    *3.2.10. Classes 10(a)-(k): Interests.*..............................................................................................10
**3.3.** EFFECT OF NON-VOTING; MODIFICATIONS.................................................................................11

## IV. TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION WITH RESPECT TO IMPAIRMENT ...............................................................................................................................11

**4.1.** TREATMENT OF CLASSES 1(A)-(K): OTHER PRIORITY CLAIMS. .................................................11
    *4.1.1. Impairment and Voting.*.......................................................................................................11
    *4.1.2. Treatment.*...........................................................................................................................11
**4.2.** TREATMENT OF CLASSES 2(A)-(K): SENIOR LENDER CLAIMS.....................................................12
    *4.2.1. Impairment and Voting.*.......................................................................................................12
    *4.2.2. Treatment.*...........................................................................................................................12
    *4.2.3. Senior Lender Election Treatment.*.......................................................................................12
    *4.2.4. Additional Provisions Related to Treatment of Holders of Class 2 Claims.*...........................12
**4.3.** TREATMENT OF CLASSES 3(A)-(K): SECOND LIEN CLAIMS.........................................................13
    *4.3.1. Impairment and Voting.*.......................................................................................................13
    *4.3.2. Treatment.*...........................................................................................................................13
**4.4.** TREATMENT OF CLASSES 4(A)-(K): MEZZANINE CLAIMS............................................................13
    *4.4.1. Impairment and Voting.*.......................................................................................................13
    *4.4.2. Treatment.*...........................................................................................................................13
**4.5.** TREATMENT OF CLASSES 5(A)-(D): JUNIOR MEZZANINE CLAIMS................................................14
    *4.5.1. Impairment and Voting.*.......................................................................................................14
    *4.5.2. Treatment.*...........................................................................................................................14
**4.6.** TREATMENT OF CLASSES 6(A)-(K) – OTHER SECURED CLAIMS...................................................14
    *4.6.1. Impairment and Voting.*.......................................................................................................14
    *4.6.2. Treatment.*...........................................................................................................................14

**4.7.** TREATMENT OF CLASSES 7(A)-(K): GENERAL UNSECURED CLAIMS. ........................................14
    *4.7.1. Impairment and Voting.* .........................................................................................................14
    *4.7.2. Treatment of Classes 7(a)-7(k).* ...........................................................................................14
**4.8.** TREATMENT OF CLASSES 8(A)-(K): INTERCOMPANY CLAIMS. ...................................................15
    *4.8.1. Impairment and Voting.* .........................................................................................................15
        4.8.1.1.     Classes 8(a)-(d). ..........................................................................................................15
        4.8.1.2.     Classes 8(e)-(k). ..........................................................................................................15
    *4.8.2. Treatment.* ...........................................................................................................................15
        4.8.2.1.     Classes 8(a)-(d). ..........................................................................................................15
        4.8.2.2.     Classes 8(e)-(k). ..........................................................................................................15
**4.9.** TREATMENT OF CLASSES 9(A)-(K): SUBORDINATED CLAIMS. ....................................................15
    *4.9.1. Impairment and Voting.* .........................................................................................................15
    *4.9.2. Treatment.* ...........................................................................................................................15
**4.10.** TREATMENT OF CLASSES 10(A)-(K): INTERESTS. ....................................................................15
    *4.10.1. Impairment and Voting.* .......................................................................................................15
        4.10.1.1.     Classes 10(a)-(d). ......................................................................................................15
        4.10.1.2.     Classes 10(e)-(k). ......................................................................................................16
    *4.10.2. Treatment.* .........................................................................................................................16
        4.10.2.1.     Class 10(a)-(d). ........................................................................................................16
        4.10.2.2.     Classes 10(e)-(k). ......................................................................................................16

**V. PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASSES, AND CONSEQUENCES OF NON-CONFIRMABILITY** ..........................................................................16

**5.1.** VOTING RIGHTS. ......................................................................................................................16
**5.2.** ACCEPTANCE REQUIREMENTS. .................................................................................................16
**5.3.** CRAM DOWN. ..........................................................................................................................16
**5.4.** TABULATION OF THE VOTES. ....................................................................................................17
**5.5.** NON-CONFIRMABILITY. ............................................................................................................17

**VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................................................18

**6.1.** ASSUMPTION AND REJECTION OF CONTRACTS AND UNEXPIRED LEASES. ..................................18
**6.2.** CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES. ................18
**6.3.** CURE OF DEFAULTS. .................................................................................................................18
**6.4.** CONTRACTS AND LEASES ENTERED INTO AFTER THE PETITION DATE. ........................................19
**6.5.** MODIFICATIONS, AMENDMENTS, SUPPLEMENTS, RESTATEMENTS, OR OTHER AGREEMENTS. ......19
**6.6.** RESERVATION OF RIGHTS. .........................................................................................................19

**VII. MEANS OF IMPLEMENTATION OF THE PLAN** ....................................................................20

**7.1.** GENERAL SETTLEMENT OF CLAIMS. ..........................................................................................20
**7.2.** SOURCES OF CONSIDERATION FOR PLAN DISTRIBUTIONS. ..........................................................20
    *7.2.1. Debtors' Available Cash.* ......................................................................................................20
    *7.2.2. Additional Facility.* ..............................................................................................................20
    *7.2.3. Transfer of Almatis B.V. Interests and Release of Security and Guarantees.* ........................20
    *7.2.4. Issuance of Equityco Shares and Equityco Warrants.* ...........................................................21
    *7.2.5. The New Facilities Agreements.* .............................................................................................21
    *7.2.6. Use of Proceeds.* ...................................................................................................................21
    *7.2.7. Avoidance Actions.* ...............................................................................................................21
    *7.2.8. Transfer of Certain Intercompany Claims to Holdco 2 and to Dutch Foundation 2.* ...............21
    *7.2.9. Transfer of Certain Intercompany Interests.* .........................................................................22
**7.3.** RULE 2004 EXAMINATIONS. ....................................................................................................22
**7.4.** CONTINUED EXISTENCE. ...........................................................................................................22
**7.5.** REVESTING OF ASSETS. ............................................................................................................22
**7.6.** IMPLEMENTATION TRANSACTIONS. ............................................................................................22
**7.7.** CANCELLATION OF SECURITIES AND AGREEMENTS. ...................................................................22
**7.8.** REORGANIZED DEBTORS; NEW TOWER COMPANIES; DUTCH FOUNDATION 2. ............................23
**7.9.** POST EFFECTIVE DATE MANAGEMENT. .....................................................................................23
**7.10.** DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS. ....................................................24

| 7.11. | New Certificates of Formation, New Bylaws of the Reorganized Debtors and New Articles of Association. | 24 |
| 7.12. | Employment, Retirement, Indemnification, and Other Related Agreements. | 24 |
| 7.13. | Effectuating Documents; Further Transactions. | 24 |
| 7.14. | Entity Action. | 25 |
| 7.15. | Section 1146 Exemption. | 25 |
| 7.16. | Preservation of Causes of Action. | 25 |
| 7.17. | Nonoccurrence of Effective Date. | 26 |

**VIII. METHOD OF DISTRIBUTIONS UNDER THE PLAN AND CLAIMS RECONCILIATION...............26**

| 8.1. | Distributions. | 26 |
| 8.2. | Actions by Disbursing Agent for Class 2, Class 3, Class 4 and Class 5 Claims. | 27 |
| 8.3. | Disbursing Agent Agreement. | 27 |
| 8.4. | Distribution Record Date. | 27 |
| 8.5. | Cash Payments. | 28 |
| 8.6. | Delivery of Distributions. | 28 |
| 8.7. | Minimum Cash Distributions. | 28 |
| 8.8. | Withholding Taxes. | 28 |
| 8.9. | Unclaimed Property. | 28 |
| 8.10. | Disputed Claims. | 28 |
| 8.11. | Objections to Claims. | 29 |
| 8.12. | Compromises and Settlements. | 29 |
| 8.13. | Reservation of Debtors' Rights. | 29 |
| 8.14. | No Distributions Pending Allowance. | 29 |
| 8.15. | No Postpetition Interest on Claims. | 29 |
| 8.16. | Claims Paid or Payable by Third Parties. | 29 |
| | 8.16.1. Claims Paid by Third Parties. | 29 |
| | 8.16.2. Amounts Received From German Escrows by Holders of Class 2 Claims Making the Senior Lender Election. | 30 |
| 8.17. | Effect of Acceptance of Distribution. | 30 |

**IX. EFFECT OF CONFIRMATION OF PLAN...............30**

| 9.1. | Discharge. | 30 |
| | 9.1.1. Discharge of Claims Against the Debtors and the Reorganized Debtors. | 30 |
| | 9.1.2. Injunction Related to the Discharge. | 30 |
| 9.2. | Releases. | 31 |
| | 9.2.1. Releases by the Debtors. | 31 |
| | 9.2.2. Certain Waivers. | 31 |
| | 9.2.3. Releases by Holders of Claims and Interests. | 32 |
| | 9.2.4. Exculpation. | 33 |
| | 9.2.5. Injunction Related to Releases and Exculpation. | 33 |
| 9.3. | No Successor Liability. | 34 |
| 9.4. | Release of Liens. | 34 |
| 9.5. | Assignment of Claims. | 34 |
| 9.6. | Release of German Escrows. | 34 |
| 9.7. | Term of Injunctions. | 34 |
| 9.8. | Binding Effect. | 35 |
| 9.9. | Dissolution of the Committee. | 35 |
| 9.10. | Post-Confirmation Date Retention of Professionals. | 35 |
| 9.11. | Indemnification of Security Trustee. | 35 |
| 9.12. | Survival of Certain Indemnification Obligations. | 35 |

**X. EFFECTIVENESS OF THE PLAN...............36**

| 10.1. | Conditions Precedent. | 36 |
| | 10.1.1. Conditions to Confirmation. | 36 |
| | 10.1.1.1. Plan Supplement. | 36 |

10.1.1.2.    Confirmation Order. ........................................................................................ 36
10.1.1.3.    Available Cash. ............................................................................................... 36
*10.1.2. Conditions to Effective Date.* ......................................................................................... *36*
10.1.2.1.    Confirmation Order. ........................................................................................ 36
10.1.2.2.    No Stay of Confirmation. ................................................................................ 36
10.1.2.3.    Receipt of Required Authorization. ............................................................... 36
10.1.2.4.    Additional Facility. ......................................................................................... 36
10.1.2.5.    New Facilities Agreements. ............................................................................ 36
10.1.2.6.    Non-Tax Liabilities. ........................................................................................ 37
10.1.2.7.    Tax Liabilities. ................................................................................................ 37
10.1.2.8.    Available Cash. ............................................................................................... 37
10.1.2.9.    Plan Supplement. ............................................................................................ 37
10.1.2.10.    Implementation Transactions. ....................................................................... 37
10.1.2.11.    German Restructuring Opinion. ..................................................................... 37
*10.1.3. Waiver.* ...................................................................................................................... *37*
**10.2.**    Effect of Failure of Conditions. ......................................................................... 37

**XI. RETENTION OF JURISDICTION** ...................................................................................... **38**

**11.1.**    Bankruptcy Court. .............................................................................................. 38

**XII. MISCELLANEOUS PROVISIONS** ..................................................................................... **40**

**12.1.**    Plan Supplement. ............................................................................................... 40
**12.2.**    Exemption for Registration Requirements. ..................................................... 40
**12.3.**    Statutory Fees. ................................................................................................... 40
**12.4.**    Third Party Agreements. ................................................................................... 40
**12.5.**    Amendment or Modification of Plan. .............................................................. 40
**12.6.**    Severability. ....................................................................................................... 41
**12.7.**    Revocation or Withdrawal of Plan. .................................................................. 41
**12.8.**    Rules Governing Conflicts Between Documents. ........................................... 41
**12.9.**    Governing Law. ................................................................................................. 42
**12.10.**    Notices. .............................................................................................................. 42
**12.11.**    Interest and Attorneys' Fees. ............................................................................ 43
**12.12.**    Binding Effect. ................................................................................................... 43
**12.13.**    No Admissions. .................................................................................................. 43
**12.14.**    Exhibits. ............................................................................................................. 43

# INTRODUCTION

Almatis B.V., DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., Almatis Holdings 9 B.V., Almatis Holdings 7 B.V., Almatis US Holding, Inc., Almatis, Inc., Almatis Asset Holdings, LLC, Blitz F07-neunhundertsechzig-drei GmbH, Almatis Holdings GmbH, and Almatis GmbH, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully propose the following Joint Prepackaged Plan of Reorganization pursuant to section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims against and Interests in each of the Debtors (the "***Plan***").

Reference is made to the Disclosure Statement with respect to the Plan, distributed contemporaneously herewith, for a discussion of the Debtors' history, businesses, properties, operations, risk factors, a summary and analysis of the Plan, and certain related matters. Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors respectfully reserve the right to alter, amend, modify, revoke, or withdraw the Plan in the manner set forth herein prior to consummation of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

THIS PLAN SHOULD BE CONSIDERED ONLY IN CONJUNCTION WITH THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH. THE DISCLOSURE STATEMENT IS INTENDED TO PROVIDE YOU WITH THE INFORMATION THAT YOU NEED TO MAKE AN INFORMED JUDGMENT WHETHER TO ACCEPT OR REJECT THE PLAN.

## I.
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**1.1.   Definitions.**  As used in the Plan, capitalized terms not otherwise defined herein shall have the meanings specified in Appendix A. Unless the context otherwise requires, any capitalized term used and not defined in the Plan, but that is defined in the Bankruptcy Code, shall have the meaning assigned to that term in the Bankruptcy Code.

**1.2.   Rules of Construction.**  For purposes of the Plan, unless otherwise provided herein:  (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement, whether existing or contemplated, or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (ii) unless otherwise specified, all references in the Plan to the Introduction, Articles, Sections, and Exhibits are references to the Introduction, Articles, Sections, and Exhibits of or to the Plan, as the same may be amended, waived, or modified from time to time, (iii) captions and headings to Articles and Sections are intended for convenience of reference only and are not intended to be part of or to affect interpretation of the Plan, (iv) the words "herein," "hereof," "hereunder," "hereto," and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan, (v) whenever it appears appropriate from the context, each pronoun stated in the masculine, feminine, or neuter

includes the masculine, feminine, and neuter, and (vi) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.3.    Computation of Time.**  In computing time prescribed or allowed by the Plan, unless otherwise expressly provided, Bankruptcy Rule 9006(a) shall apply.

**II.**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIMS AGAINST THE DEBTORS**

**2.1.    Administrative Expense Claims.**  On the later of (i) the Effective Date or (ii) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, the Debtors shall either (x) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (y) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors and such Holder shall have agreed upon; *provided, however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (x).  Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court.

**2.2.    Professional Compensation Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 30 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive: (i) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (a) the Effective Date or (b) three business days after the order granting such Person's final fee application becomes a Final Order; or (ii) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Reorganized Debtors (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases).  All Professional Compensation Claims for services rendered after the Confirmation Date shall be paid by the Reorganized Debtors (or the Debtors prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as the Reorganized Debtors (or the Debtors prior to the Effective Date) and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

**2.3.    Priority Tax Claims.**  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, or at the Debtors' election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code.

**2.4.    DIP Facility Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, DIP Facility Claims shall be Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date.

**2.5.    U.S. Trustee Fees.**  U.S. Trustee Fees incurred prior to the Effective Date shall be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees.  Until each of the Chapter 11 Cases is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees shall be paid by the Reorganized Debtors.

**III.**
**CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN DEBTORS**

**3.1.    Classification of Claims.**  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date.  The fact that a particular Class of Claims is designated for a Debtor does not necessarily mean there are any Allowed Claims in such Class against such Debtor.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II.

The Plan constitutes a separate chapter 11 subplan for each of the Debtors.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.

**3.2.    Classes.**  The Claims against and Interests in the Debtors are classified as follows:

**3.2.1.  Classes 1(a)-(k): Other Priority Claims.**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1(a) | Other Priority Claims against DIC Almatis Bidco B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1(b) | Other Priority Claims against Almatis Holdings 3 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(c) | Other Priority Claims against Almatis Holdings 9 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(d) | Other Priority Claims against Almatis B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(e) | Other Priority Claims against Almatis Holdings 7 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(f) | Other Priority Claims against Almatis US Holding, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(g) | Other Priority Claims against Almatis, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(h) | Other Priority Claims against Almatis Asset Holdings, LLC | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(i) | Other Priority Claims against Blitz F07- neunhundertsechzig-drei GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(j) | Other Priority Claims against Almatis Holdings GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 1(k) | Other Priority Claims against Almatis GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |

### 3.2.2. Classes 2(a)-(k): Senior Lender Claims.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 2(a) | Senior Lender Claims against DIC Almatis Bidco B.V. | Impaired | Entitled to vote |
| Class 2(b) | Senior Lender Claims against Almatis Holdings 3 B.V. | Impaired | Entitled to vote |
| Class 2(c) | Senior Lender Claims against Almatis Holdings 9 B.V. | Impaired | Entitled to vote |
| Class 2(d) | Senior Lender Claims against Almatis B.V. | Impaired | Entitled to vote |

| Class 2(e) | Senior Lender Claims against Almatis Holdings 7 B.V. | Impaired | Entitled to vote |
|---|---|---|---|
| Class 2(f) | Senior Lender Claims against Almatis US Holding, Inc. | Impaired | Entitled to vote |
| Class 2(g) | Senior Lender Claims against Almatis, Inc. | Impaired | Entitled to vote |
| Class 2(h) | Senior Lender Claims against Almatis Asset Holdings, LLC | Impaired | Entitled to vote |
| Class 2(i) | Senior Lender Claims against Blitz F07- neunhundertsechzig-drei GmbH | Impaired | Entitled to vote |
| Class 2(j) | Senior Lender Claims against Almatis Holdings GmbH | Impaired | Entitled to vote |
| Class 2(k) | Senior Lender Claims against Almatis GmbH | Impaired | Entitled to vote |

### 3.2.3. Classes 3(a)-(k): Second Lien Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 3(a) | Second Lien Claims against DIC Almatis Bidco B.V. | Impaired | Entitled to vote |
| Class 3(b) | Second Lien Claims against Almatis Holdings 3 B.V. | Impaired | Entitled to vote |
| Class 3(c) | Second Lien Claims against Almatis Holdings 9 B.V. | Impaired | Entitled to vote |
| Class 3(d) | Second Lien Claims against Almatis B.V. | Impaired | Entitled to vote |
| Class 3(e) | Second Lien Claims against Almatis Holdings 7 B.V. | Impaired | Entitled to vote |
| Class 3(f) | Second Lien Claims against Almatis US Holding, Inc. | Impaired | Entitled to vote |
| Class 3(g) | Second Lien Claims against Almatis, Inc. | Impaired | Entitled to vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 3(h) | Second Lien Claims against Almatis Asset Holdings, LLC | Impaired | Entitled to vote |
| Class 3(i) | Second Lien Claims against Blitz F07- neunhundertsechzig-drei GmbH | Impaired | Entitled to vote |
| Class 3(j) | Second Lien Claims against Almatis Holdings GmbH | Impaired | Entitled to vote |
| Class 3(k) | Second Lien Claims against Almatis GmbH | Impaired | Entitled to vote |

### 3.2.4. Classes 4(a)-(k): Mezzanine Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 4(a) | Mezzanine Claims against DIC Almatis Bidco B.V. | Impaired | Entitled to vote |
| Class 4(b) | Mezzanine Claims against Almatis Holdings 3 B.V. | Impaired | Entitled to vote |
| Class 4(c) | Mezzanine Claims against Almatis Holdings 9 B.V. | Impaired | Entitled to vote |
| Class 4(d) | Mezzanine Claims against Almatis B.V. | Impaired | Entitled to vote |
| Class 4(e) | Mezzanine Claims against Almatis Holdings 7 B.V. | Impaired | Entitled to vote |
| Class 4(f) | Mezzanine Claims against Almatis US Holding, Inc. | Impaired | Entitled to vote |
| Class 4(g) | Mezzanine Claims against Almatis, Inc. | Impaired | Entitled to vote |
| Class 4(h) | Mezzanine Claims against Almatis Asset Holdings, LLC | Impaired | Entitled to vote |
| Class 4(i) | Mezzanine Claims against Blitz F07- neunhundertsechzig-drei GmbH | Impaired | Entitled to vote |
| Class 4(j) | Mezzanine Claims against Almatis Holdings GmbH | Impaired | Entitled to vote |

| | | | |
|---|---|---|---|
| Class 4(k) | Mezzanine Claims against Almatis GmbH | Impaired | Entitled to vote |

### 3.2.5.  Classes 5(a)-(d): Junior Mezzanine Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 5(a) | Junior Mezzanine Claims against DIC Almatis Bidco B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 5(b) | Junior Mezzanine Claims against Almatis Holdings 3 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 5(c) | Junior Mezzanine Claims against Almatis Holdings 9 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 5(d) | Junior Mezzanine Claims against Almatis B.V. | Impaired | Not entitled to vote (Deemed to reject) |

### 3.2.6.  Classes 6(a)-(k): Other Secured Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6(a) | Other Secured Claims against DIC Almatis Bidco B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(b) | Other Secured Claims against Almatis Holdings 3 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(c) | Other Secured Claims against Almatis Holdings 9 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(d) | Other Secured Claims against Almatis B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(e) | Other Secured Claims against Almatis Holdings 7 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(f) | Other Secured Claims against Almatis US Holding, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(g) | Other Secured Claims against Almatis, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(h) | Other Secured Claims against Almatis Asset Holdings, LLC | Unimpaired | Not entitled to vote (Presumed to accept) |

| Class 6(i) | Other Secured Claims against Blitz F07- neunhundertsechzig-drei GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(j) | Other Secured Claims against Almatis Holdings GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 6(k) | Other Secured Claims against Almatis GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |

### 3.2.7. Classes 7(a)-(k): General Unsecured Claims.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7(a) | General Unsecured Claims against DIC Almatis Bidco B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(b) | General Unsecured Claims against Almatis Holdings 3 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(c) | General Unsecured Claims against Almatis Holdings 9 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(d) | General Unsecured Claims against Almatis B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(e) | General Unsecured Claims against Almatis Holdings 7 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(f) | General Unsecured Claims against Almatis US Holding, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(g) | General Unsecured Claims against Almatis, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(h) | General Unsecured Claims against Almatis Asset Holdings, LLC | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(i) | General Unsecured Claims against Blitz F07- neunhundertsechzig-drei GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(j) | General Unsecured Claims against Almatis Holdings GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 7(k) | General Unsecured Claims against Almatis GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |

### 3.2.8.  Classes 8(a)-(k): Intercompany Claims.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 8(a) | Intercompany Claims against DIC Almatis Bidco B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 8(b) | Intercompany Claims against Almatis Holdings 3 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 8(c) | Intercompany Claims against Almatis Holdings 9 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 8(d) | Intercompany Claims against Almatis B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 8(e) | Intercompany Claims against Almatis Holdings 7 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(f) | Intercompany Claims against Almatis US Holding, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(g) | Intercompany Claims against Almatis, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(h) | Intercompany Claims against Almatis Asset Holdings, LLC | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(i) | Intercompany Claims against Blitz F07- neunhundertsechzig-drei GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(j) | Intercompany Claims against Almatis Holdings GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 8(k) | Intercompany Claims against Almatis GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |

### 3.2.9.  Classes 9(a)-(k): Subordinated Claims.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 9(a) | Subordinated Claims against DIC Almatis Bidco B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(b) | Subordinated Claims against Almatis Holdings 3 B.V. | Impaired | Not entitled to vote (Deemed to reject) |

| Class 9(c) | Subordinated Claims against Almatis Holdings 9 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
|---|---|---|---|
| Class 9(d) | Subordinated Claims against Almatis B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(e) | Subordinated Claims against Almatis Holdings 7 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(f) | Subordinated Claims against Almatis US Holding, Inc. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(g) | Subordinated Claims against Almatis, Inc. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(h) | Subordinated Claims against Almatis Asset Holdings, LLC | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(i) | Subordinated Claims against Blitz F07- neunhundertsechzig-drei GmbH | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(j) | Subordinated Claims against Almatis Holdings GmbH | Impaired | Not entitled to vote (Deemed to reject) |
| Class 9(k) | Subordinated Claims against Almatis GmbH | Impaired | Not entitled to vote (Deemed to reject) |

### 3.2.10. Classes 10(a)-(k): Interests.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 10(a) | Intercompany Interests in DIC Almatis Bidco B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(b) | Intercompany Interests in Almatis Holdings 3 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(c) | Intercompany Interests in Almatis Holdings 9 B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(d) | Intercompany Interests in Almatis B.V. | Impaired | Not entitled to vote (Deemed to reject) |
| Class 10(e) | Intercompany Interests in Almatis Holdings 7 B.V. | Unimpaired | Not entitled to vote (Presumed to accept) |

| Class 10(f) | Intercompany Interests in Almatis US Holding, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
|---|---|---|---|
| Class 10(g) | Intercompany Interests in Almatis, Inc. | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 10(h) | Intercompany Interests in Almatis Asset Holdings, LLC | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 10(i) | Intercompany Interests in Blitz F07- neunhundertsechzig-drei GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 10(j) | Intercompany Interests in Almatis Holdings GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |
| Class 10(k) | Intercompany Interests in Almatis GmbH | Unimpaired | Not entitled to vote (Presumed to accept) |

**3.3. Effect of Non-Voting; Modifications.** At the Confirmation Hearing, the Debtors will seek a ruling that if no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims or Interests in such Class for the purposes of section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to modify the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, *provided*, such modifications are consistent with Section 12.5 below.

# IV.
# TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION WITH RESPECT TO IMPAIRMENT

**4.1. Treatment of Classes 1(a)-(k): Other Priority Claims.**

**4.1.1. Impairment and Voting.** Classes 1(a)-(k) are Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.1.2. Treatment.** On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (i) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (ii) such other treatment that the Debtors and such Holder shall have agreed upon in writing; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i).

**4.2. Treatment of Classes 2(a)-(k): Senior Lender Claims.**

**4.2.1. Impairment and Voting.** Classes 2(a)-(k) are Impaired by the Plan. Each Holder of an Allowed Senior Lender Claim as of the Record Date is entitled to vote to accept or reject the Plan.

**4.2.2. Treatment.** Each Holder of an Allowed Senior Lender Claim shall, subject to the Senior Lender Election, in exchange for such Claim and in accordance with the Class 2 Option A Distribution Procedures, receive the Option A Consideration and the benefit of the provisions of Section 4.2.4 below. If the Holder of a Senior Lender Claim makes the Senior Lender Election, such Holder shall receive the treatment specified in Section 4.2.3 in lieu of the treatment specified in this Section 4.2.2. It is a condition precedent to the receipt of the Option A Consideration that the Holder of an Allowed Senior Lender Claim entitled to receive such consideration comply with the Class 2 Option A Distribution Procedures, including execution of the New SFA, the New ICA, the Shareholder Agreement, and ratification of the actions taken on behalf of such Holder by the Disbursing Agent.

**4.2.3. Senior Lender Election Treatment.** Each Holder of an Allowed Senior Lender Claim may, by timely exercise of the Senior Lender Election set forth on the Ballot with respect to all of such Holder's Allowed Senior Lender Claims, make the Senior Lender Election. Any Holder that makes the Senior Lender Election shall, in lieu of any distribution pursuant to Section 4.2.2, in exchange for its Allowed Senior Lender Claim and in accordance with the Class 2 Option B Distribution Procedures, receive the Option B Consideration and the benefit of the provisions of Section 4.2.4 below. It is a condition precedent to the receipt of the Option B Consideration that the Holder of an Allowed Senior Lender Claim entitled to receive such consideration comply with the Class 2 Option B Distribution Procedures, including execution of the New Subordinated Agreement, the New ICA, the Shareholder Agreement, and ratification of the actions taken on behalf of such Holder by the Disbursing Agent. **Holders of Senior Lender Claims who make the Senior Lender Election and vote to accept the Plan will not be able to opt out of the release provisions of Section 9.2.3 and will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.** No Senior Lender Election shall be valid unless it is timely made by exercise of the Senior Lender Election with respect to all of such Holder's Allowed Senior Lender Claims; any Senior Lender that makes an invalid Senior Lender Election, or does not make the Senior Lender Election, shall be treated pursuant to Section 4.2.2.

**4.2.4. Additional Provisions Related to Treatment of Holders of Class 2 Claims.** As additional consideration to the Holders of Allowed Senior Lender Claims, (a) the Intercompany Claims owned by Almatis Holdings 3. B.V., including those transferred from DIC Almatis Bidco B.V. prior to the Petition Date, shall, for the benefit of the Senior Lenders, be assigned and transferred to Holdco 2 by Almatis Holdings 3 B.V., pursuant to the Intercompany Claim Assignment Agreement, free and clear of any and all Claims and Liens of the Financial Lenders; and (b) (i) the Interests in Almatis B.V. shall, for the benefit of the Senior Lenders, be transferred and assigned to Holdco 2, free and clear of any and all Claims and Liens of the Financial Lenders, and (ii) the Interests in DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., and Almatis Holdings 9 B.V. shall, for the benefit of the Senior Lenders, be deemed to be and

shall be transferred and assigned by DIC Almatis Midco B.V., DIC Almatis Bidco B.V., and Almatis Holdings 3 B.V., respectively, to Dutch Foundation 2, free and clear of any and all Claims and Liens of the Financial Lenders, all in accordance with the Implementation Memorandum. In addition, the Security Trustee shall retain the pledge on the Intercompany Interests in Almatis B.V. and its subsidiaries that are Debtors and, on or prior to the Effective Date, but after the transfers described in the preceding sentence of this Section 4.2.4, and in accordance with the Implementation Memorandum, shall, to the extent permitted by the Intercreditor Agreement, release all Claims, whether direct, guaranty or otherwise, of the Financial Lenders against Almatis B.V. and its Debtor subsidiaries, and all security granted by Almatis B.V. and its Debtor subsidiaries. The Confirmation Order shall provide that the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified to permit the Security Trustee, after the Confirmation Date, to exercise any and all rights, including the right to enforce the pledge on the Intercompany Interests in Almatis B.V., as provided in this Section 4.2.4.

### 4.3. Treatment of Classes 3(a)-(k): Second Lien Claims.

**4.3.1. Impairment and Voting.** Classes 3(a)-(k) are Impaired by the Plan. Each Holder of an Allowed Second Lien Claim as of the Record Date is entitled to vote to accept or reject the Plan.

**4.3.2. Treatment.** Each Holder of an Allowed Second Lien Claim shall, in exchange for such Claim and in accordance with the Class 3 Distribution Procedures, receive its Pro Rata Share of the Equityco Class 3 Warrants. It is a condition precedent to the receipt of the Equityco Class 3 Warrants that the Holder of an Allowed Second Lien Claim entitled to receive such consideration comply with the Class 3 Distribution Procedures, including ratification of the actions taken on behalf of such Holder by the Disbursing Agent. The treatment of Allowed Second Lien Claims reflects a consensual waiver by and distribution from the Senior Lenders of consideration otherwise distributable to the Senior Lenders under the subordination provisions of the Intercreditor Agreement.

### 4.4. Treatment of Classes 4(a)-(k): Mezzanine Claims.

**4.4.1. Impairment and Voting.** Classes 4(a)-(k) are Impaired by the Plan. Each Holder of an Allowed Mezzanine Claim as of the Record Date is entitled to vote to accept or reject the Plan.

**4.4.2. Treatment.** Each Holder of an Allowed Mezzanine Claim shall, in exchange for such Claim and in accordance with the Class 4 Distribution Procedures, receive its Pro Rata Share of the Equityco Class 4 Warrants. It is a condition precedent to the receipt of the Equityco Class 4 Warrants that the Holder of an Allowed Mezzanine Claim entitled to receive such consideration comply with the Class 4 Distribution Procedures, including ratification of the actions taken on behalf of such Holder by the Disbursing Agent. The treatment of Allowed Mezzanine Claims reflects a consensual waiver by and distribution from the Senior Lenders of consideration otherwise distributable to the Senior Lenders under the subordination provisions of the Intercreditor Agreement.

**4.5.    Treatment of Classes 5(a)-(d): Junior Mezzanine Claims.**

**4.5.1.  Impairment and Voting.**  Classes 5(a)-(d) are Impaired by the Plan.  Each Holder of an Allowed Junior Mezzanine Claim as of the Record Date is deemed to have rejected the Plan.

**4.5.2.  Treatment.**  Each Allowed Junior Mezzanine Claim shall be cancelled and discharged in the manner provided in the Confirmation Order, the Disbursing Agent Agreement, and the Implementation Memorandum, and the Holder of such Allowed Junior Mezzanine Claim shall not receive any distribution under the Plan.

**4.6.    Treatment of Classes 6(a)-(k) – Other Secured Claims.**

**4.6.1.  Impairment and Voting.**  Classes 6(a)-(k) are Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.6.2.  Treatment.**  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of and in exchange for each Other Secured Claim, each Allowed Other Secured Claim shall be reinstated or otherwise rendered Unimpaired.

**4.7.    Treatment of Classes 7(a)-(k): General Unsecured Claims.**

**4.7.1.  Impairment and Voting.**  Classes 7(a)-(k) are Unimpaired by the Plan. Each Holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.7.2.  Treatment of Classes 7(a)-7(k).**  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed General Unsecured Claim in Classes 7(a)-7(k) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if a General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the applicable Debtor (or, after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such General Unsecured Claim.  The Debtors reserve their rights to dispute in the Bankruptcy Court or any other court with jurisdiction the validity of any General Unsecured Claim at any time prior to the Claims Objection Bar Date.

### 4.8. Treatment of Classes 8(a)-(k): Intercompany Claims.

#### 4.8.1. Impairment and Voting.

4.8.1.1.     *Classes 8(a)-(d).*  Classes 8(a)-(d) are Impaired by the Plan. Each Holder of an Allowed Intercompany Claim in Classes 8(a)-(d) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

4.8.1.2.     *Classes 8(e)-(k).*  Classes 8(e)-(k) are Unimpaired by the Plan.  Each Holder of an Allowed Intercompany Claim in Classes 8(e)-(k) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

#### 4.8.2. Treatment.

4.8.2.1.     *Classes 8(a)-(d).*  Each Holder of an Allowed Intercompany Claim in Classes 8(a)-(d) shall not receive any distribution under the Plan. Notwithstanding the foregoing, pursuant to the Intercompany Claim Assignment Agreement, Intercompany Claims in Class 8(d) owned by Almatis 3 B.V, including those transferred from DIC Almatis Bidco B.V. prior to the Petition Date, will be preserved and assigned, for the benefit of the Holders of Senior Lender Claims, to Holdco 2, free and clear of any and all Liens and Claims of the Financial Lenders, as provided in the Implementation Memorandum.

4.8.2.2.     *Classes 8(e)-(k).*  To preserve the Debtors' corporate structure for the benefit of the Holders of the Allowed Senior Lender Claims, Intercompany Claims in Classes 8(e)-(k) will be reinstated as of the Effective Date.  Notwithstanding the foregoing, pursuant to the Intercompany Claim Assignment Agreement, any Intercompany Claims held by Almatis Holdings 3. B.V., and not assigned to Holdco 2 pursuant to Section 4.8.2.1 above, will be assigned, for the benefit of the Holders of Senior Lender Claims, to Holdco 2, free and clear of any and all Liens and Claims of the Financial Lenders, as provided in the Implementation Memorandum.

### 4.9. Treatment of Classes 9(a)-(k): Subordinated Claims.

**4.9.1. Impairment and Voting.**  Classes 9(a)-(k) are Impaired by the Plan.  Each Holder of an Allowed Subordinated Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

**4.9.2. Treatment.**  Each Allowed Subordinated Claim shall be cancelled and discharged in the manner provided in the Implementation Memorandum, and the Holder of such Allowed Subordinated Claim shall not receive any distribution under the Plan.

### 4.10. Treatment of Classes 10(a)-(k): Interests.

#### 4.10.1. Impairment and Voting.

4.10.1.1.     *Classes 10(a)-(d).*  Classes 10(a)-(d) are Impaired by the Plan.  Each Holder of an Interest in Classes 10(a)-(d) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

4.10.1.2.    *Classes 10(e)-(k).*  Classes 10(e)-(k) are Unimpaired by the Plan.  Each Holder of an Interest in Classes 10(e)-(k) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### 4.10.2.  Treatment.

4.10.2.1.    *Classes 10(a)-(d).*    Each Holder of an Interest in Classes 10(a)-(d) shall not receive any distribution under the Plan.  Notwithstanding the foregoing, on or prior to the Effective Date, and in accordance with the Implementation Memorandum, (i) the Interests in Almatis B.V. shall, for the benefit of the Senior Lenders, be deemed to be and shall be transferred and assigned to Holdco 2, free and clear of any and all Claims and Liens of the Financial Lenders, and (ii) the Interests in DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., and Almatis Holdings 9 B.V. shall, for the benefit of the Senior Lenders, be deemed to be and shall be transferred and assigned by DIC Almatis Midco B.V., DIC Almatis Bidco B.V., and Almatis Holdings 3 B.V., respectively, to Dutch Foundation 2, free and clear of any and all Claims and Liens of the Financial Lenders.

4.10.2.2.    *Classes 10(e)-(k).*  To preserve the Debtors' corporate structure for the benefit of the Holders of Allowed Senior Lender Claims, Allowed Second Lien Claims and Allowed Mezzanine Claims, the Interests in each of Classes 10(e)-(k) shall be reinstated.

### V.
### PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASSES, AND CONSEQUENCES OF NON-CONFIRMABILITY

**5.1.    Voting Rights.**  Each Holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Interests that is not deemed to have rejected the Plan, and that held such Claim as of the Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the Ballot Instructions.  Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Scheduling Motion, and are described in the Disclosure Statement.

**5.2.    Acceptance Requirements.**  An Impaired Class of Claims shall have accepted the Plan if votes in favor of the Plan have been cast by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

**5.3.    Cram Down.**  If all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of subsection 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan or any Subplan incorporated therein.  If the Debtors and the Requisite Senior Lenders determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code without eliminating the distribution to a junior Class or Classes, the Plan shall be automatically modified to eliminate such distribution, the Class or Classes as to which

distributions are eliminated shall be deemed to be a rejecting Class or Classes, and the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan, as so modified, in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan.

**5.4.    Tabulation of the Votes.**    The Debtors shall tabulate all votes on a non-consolidated basis by Class.  If no Impaired Classes accept the Plan, or any Debtor's Subplan incorporated therein, the Debtors may modify the Plan, or such Subplan, to appropriately address the rights of the Holders of Allowed Claims.

**5.5.    Non-Confirmability.**

**5.5.1.**    Except as provided in section 5.5.2 hereof related to the Subplan for DIC Almatis Bidco B.V., if the Plan, or any Debtor's Subplan incorporated therein, has not been accepted by the Classes of Claims entitled to vote with respect thereto in accordance with Section 5.2 hereof, and the Debtors determine that the Plan, or such Subplan, cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan, or such Subplan, the Debtors may seek to (i) propose a new plan or plans of reorganization for the Debtors or for the Debtor that is the subject of such Subplan, (ii) amend the current Plan or any Subplan incorporated therein to satisfy any and all objections, (iii) withdraw the Plan or the relevant Subplan or (iv) convert or dismiss the Chapter 11 Cases or the Chapter 11 Case of the Debtor or Debtors that are the subject of the Plan or the relevant Subplan.

**5.5.2.**    If the Subplan as to DIC Almatis Bidco B.V. has not been accepted by the Classes of Claims entitled to vote with respect thereto in accordance with Section 5.2 hereof, and the Debtors determine that such Subplan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of such Subplan, such Subplan shall automatically be withdrawn and not considered a part of this Plan unless, in their sole discretion, the Debtors elect either to (i) propose a new chapter 11 plan for DIC Almatis Bidco B.V., or (ii) seek to amend such Subplan to satisfy any and all objections.

**5.5.3.**    Notwithstanding the generality of the foregoing, in the event that the Debtors determine that any Subplan cannot be confirmed under section 1129(b) of the Bankruptcy Code because the Subplan proposes that the Holders of Interests in Classes 10(e)-(k) are Unimpaired, the Plan shall, automatically and without the need for further solicitation from any Class, be amended to distribute such Interests as additional distributions to the Holders of Class 2(a)-2(k) Claims, as may be applicable, which Holders shall be deemed to contribute such Interests to maintain the corporate structure of the Debtors, as provided in the Implementation Memorandum.  In addition, in the event that the Debtors determine that any Subplan cannot be confirmed under section 1129(b) of the Bankruptcy Code because such Subplan proposes that Holders of Intercompany Claims in Classes 8(e)-8(k) are Unimpaired, the Subplan shall, automatically and without the need for further solicitation from any Class, be amended to

eliminate any distributions on account of such Intercompany Claims and such Intercompany Claims shall be cancelled and discharged without any distribution.

**VI.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**6.1. Assumption and Rejection of Contracts and Unexpired Leases.** Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person, including, but not limited to, all Intercompany Contracts, shall be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date, except for any such contract or lease (i) that has been assumed, rejected, or renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that is the subject of a motion to reject, or a motion to approve renegotiated terms and to assume or reject on such renegotiated terms, that has been filed and served prior to the Effective Date, or (iii) that is identified on the Rejected Executory Contract and Unexpired Lease List or in this Plan. Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases provided for herein. For the avoidance of doubt, on the Effective Date, the applicable Debtors shall assume the Collective Bargaining Agreements, the Executive Management Contracts (as modified by the Bonus Term Sheet), and all obligations under the Pension Plans. Each Executory Contract and Unexpired Lease assumed pursuant to this Section 6.1 or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under section 365 of the Bankruptcy Code.

**6.2. Claims Based on Rejection of Executory Contracts or Unexpired Leases.** A Proof of Claim with respect to a Claim arising from the rejection of an Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of the order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 4.7 of the Plan or, if determined to be Subordinated Claims, in accordance with Section 4.9 of the Plan.

**6.3. Cure of Defaults.** Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the Cure Claim, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate

assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 20 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Scheduling Order related to assumption of Executory Contracts and Unexpired Leases. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**6.4. Contracts and Leases Entered into after the Petition Date.** Contracts and leases entered into during the Postpetition Period by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.5. Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided in the Plan or in the order assuming an Executory Contract or Unexpired Lease, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Postpetition Period shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**6.6. Reservation of Rights.** Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such

contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order to resolve and to alter their treatment of such contract or lease.

## VII.
## MEANS OF IMPLEMENTATION OF THE PLAN

**7.1.    General Settlement of Claims.**    As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. Subject to Article VIII hereof, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final. Except to the extent set forth herein, the provisions of the Intercreditor Agreement shall remain in full force and effect and shall be enforced relative to the Plan; including, without limitation, with respect to any member of the Almatis Group that is not a proponent of the Plan, and with respect to any party that, notwithstanding the provisions of the Plan that are binding on creditors and equity holders of the Almatis Group wherever located, claims not to be bound by the Plan.

**7.2.    Sources of Consideration for Plan Distributions.**

**7.2.1. Debtors' Available Cash.**    Cash will be available from the Debtors' operations.

**7.2.2. Additional Facility.**    On or after the Effective Date, Almatis B.V. and certain of the other Debtors may enter into the Additional Facility, which will provide up to $25,000,000 in revolving credit capacity that can be used for the purposes set forth in the Debt Term Sheet. If the Additional Facility is to be implemented on the Effective Date, Confirmation of the Plan shall be deemed to be approval of the Additional Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith) and authorization for the Reorganized Debtors to enter into and execute the Additional Facility, subject to such modifications as the Reorganized Debtors and the lenders with respect to the Additional Facility may deem to be reasonably necessary to consummate the transactions contemplated under such Additional Facility.

**7.2.3. Transfer of Almatis B.V. Interests and Release of Security and Guarantees.**    The automatic stay shall be modified after the Confirmation Date to permit, in accordance with the Implementation Memorandum: (a) the Security Trustee to enforce its Lien with respect to the Interests in Almatis B.V. and to transfer such Interests in Almatis B.V. to Holdco 2 free and clear, to the extent permitted under the Intercreditor Agreement, of any and all Liens or Claims of the Financial Lenders, (b) the release of security and guarantees granted by Almatis B.V. and applicable members of the Almatis Group to the Security Trustee, and (c) the

Security Trustee to execute upon guarantees granted in its favor by Almatis B.V. and applicable members of the Almatis Group.

**7.2.4. Issuance of Equityco Shares and Equityco Warrants.**  The Equityco Shares and Equityco Warrants will be issued as provided in Article IV of the Plan.

All of the shares of Equityco issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable.  Each Distribution and issuance referred to in Article VIII hereof shall be governed by the terms and conditions set forth in the Plan applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Person receiving such Distributions or issuance.  Except as otherwise provided in the Shareholder Agreement, every holder of Equityco Shares, Equityco Warrants and Management Instruments shall enter into the Shareholder Agreement; *provided, further,* that no Distribution shall be made with respect to a Senior Lender Claim unless the Holder of such Claim executes the Shareholder Agreement.  Equityco Shares and Equityco Warrants issued pursuant to Article IV of the Plan shall be subject to dilution (as provided in the Equity Term Sheet) and to adjustment from time to time for any stock splits, stock dividends, reverse stock splits, reclassifications, and the like occurring after the Effective Date in respect of the Equityco Shares and Equityco Warrants.

**7.2.5. The New Facilities Agreements.**  On the Effective Date, Holdco shall issue the New Junior Debt pursuant to the New Subordinated Agreement and Reorganized Almatis B.V., Almatis Holdings GmbH and Almatis US Holding, Inc. shall issue the New Senior Debt pursuant to the New SFA.  Confirmation shall be deemed approval of the New Facilities Agreements and the New ICA (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the New Tower Companies, the Debtors and the Reorganized Debtors in connection therewith) and authorization and direction for the applicable New Tower Companies and Reorganized Debtors to enter into and execute the New Facilities Agreements and the New ICA, subject to such modifications as they may deem to be reasonably necessary to consummate such New Facilities Agreements and the New ICA.

**7.2.6. Use of Proceeds.**  Cash, debt and equity available from the sources described in Sections 7.2.1 – 7.2.5 above shall be used by the Reorganized Debtors (i) to fund the Debtors' exit from the Chapter 11 Cases, including, without limitation, the funding of (a) Allowed Administrative Expense Claims, (b) Allowed Professional Compensation Claims, (c) Allowed Priority Tax Claims, (d) Allowed Other Priority Claims, and (e) Distributions to be made on the Distribution Date; and (ii) to fund ongoing operating expenses of the Reorganized Debtors.

**7.2.7. Avoidance Actions.**  Avoidance Actions are hereby waived and shall expressly not be preserved on and after the Effective Date.

**7.2.8. Transfer of Certain Intercompany Claims to Holdco 2 and to Dutch Foundation 2.**  In accordance with the Implementation Memorandum, and on or prior to the Effective Date, Almatis Holdings 3 B.V. will transfer the Intercompany Claims it owns against

any of the Debtors to Holdco 2 pursuant to the Intercompany Claim Assignment Agreement, free and clear of any and all Claims and Liens of the Financial Lenders.

**7.2.9. Transfer of Certain Intercompany Interests.**  In accordance with the Implementation Memorandum, and on or prior to the Effective Date: (a) the Interests in Almatis B.V. shall, for the benefit of the Senior Lenders, be transferred and assigned to Holdco 2, free and clear of any and all Claims and Liens of the Financial Lenders, and (b) the Interests in DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., and Almatis Holdings 9 B.V. shall, for the benefit of the Senior Lenders, be deemed to be and shall be transferred and assigned by DIC Almatis Midco B.V., DIC Almatis Bidco B.V., and Almatis Holdings 3 B.V., respectively, to Dutch Foundation 2, free and clear of any and all Claims and Liens of the Financial Lenders.

**7.3.    Rule 2004 Examinations.**  The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 shall be expressly preserved following the Effective Date.

**7.4.    Continued Existence.**  Except as provided herein, each Debtor will continue to exist on or after the Effective Date as a separate corporate or other applicable entity, with all the rights and powers applicable to such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

**7.5.    Revesting of Assets.**  Except as expressly provided herein, the Assets of each Debtor's Estate shall revest with the respective Reorganized Debtor on the Effective Date.  The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided herein.  As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, except as, and to the extent, provided in the Plan.

**7.6.    Implementation Transactions.**  In connection with implementation of the Plan, the New Tower Companies, the Disbursing Agent and the Debtors (or, after the Effective Date, the Reorganized Debtors) (i) shall effectuate the Plan through the transactions described in the Implementation Memorandum, (ii) may merge, dissolve, transfer assets, or otherwise consolidate any of the Debtors in furtherance of the Plan (and, prior to the Effective Date, with the consent of the Requisite Senior Lenders (acting reasonably)) and (iii) may engage in any other transaction in furtherance of the Plan (and, prior to the Effective Date, with the consent of the Requisite Senior Lenders (acting reasonably)).  Any such transaction may be effected prior to, on or subsequent to the Effective Date without the necessity for any further authorization by Holders of Interests or the directors, managers or other responsible persons of any of the Debtors.

**7.7.    Cancellation of Securities and Agreements.**  On the Effective Date, the Plan shall be consummated in accordance with the provisions set forth herein and, upon the effectiveness of such transactions:  (i) the Claims against and Interests in the Debtors, whether arising under the Senior Credit Facility, the Swap Agreements, the Mezzanine Credit Agreement, the Junior Mezzanine Credit Agreement, or under any other Certificate, Interest, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or

indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such Certificates, notes, or other instruments or document evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated pursuant to the Plan), shall be cancelled, and the Reorganized Debtors shall not have any continuing obligations therefor; and (ii) the Claims against and Interests in the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, formation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however*, that notwithstanding Confirmation or consummation, the Senior Credit Facility, the Swap Agreements, the Mezzanine Credit Agreement, the Junior Mezzanine Agreement, the Intercreditor Agreement and any other similar agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing such Holder to receive Distributions under and in accordance with the Plan and, with respect to the Intercreditor Agreement, with respect to any member of the Almatis Group that is not a proponent of the Plan, and with respect to any party that, notwithstanding the provisions of the Plan that are binding on creditors and equity holders of the Almatis Group wherever located, claims not to be bound by the Plan; *provided further, however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors without the express, written consent of Equityco; and *provided further, however*, that the foregoing shall not effect the cancellation of the Equityco Equity Interests, any Interests in Holdco, Holdco2 or Almatis B.V. or, except as provided in the Plan, any Interest in any other Debtor.

**7.8. Reorganized Debtors; New Tower Companies; Dutch Foundation 2.** On the Effective Date, the New Boards of the New Tower Companies and each Reorganized Debtor shall be appointed, and each shall adopt its New Certificates of Formation, New Articles of Association and/or New Bylaws (as applicable). On the Effective Date, Dutch Foundation 2 shall be formed; the New Articles of Association of Dutch Foundation 2 shall be filed in the Plan Supplement. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other action necessary and desirable to consummate the Plan. The Corporate Structure and Governance Documents, which evidence the new corporate and corporate governance structure of the New Tower Companies and the Reorganized Debtors, will be substantially in the form filed in the Plan Supplement.

**7.9. Post Effective Date Management.** Pursuant to the provisions of the Corporate Structure and Governance Documents and the Reorganized Debtors' operative constituent documents, which may be amended from time to time, the operation, management, and control of the New Tower Companies and the Reorganized Debtors shall be the general responsibility of their respective board of directors or managers and senior officers (as provided under applicable law), which shall thereafter have the responsibility for the management, control, and operation of the New Tower Companies and the Reorganized Debtors. Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**7.10.    Directors and Officers of the Reorganized Debtors.**  On and after the Effective Date, the business and affairs of the New Tower Companies and the Reorganized Debtors will be managed by the New Boards and the officers, directors, managers or other responsible persons identified in the Plan Supplement.  Biographical information regarding these proposed officers, directors, managers and other responsible persons will be set forth in the Plan Supplement.  A schedule of the annual compensation to be paid to persons serving as executives, officers, directors, managers or responsible persons as of the Effective Date will be set forth in the Plan Supplement.

**7.11.    New Certificates of Formation, New Bylaws of the Reorganized Debtors and New Articles of Association.**  The New Certificates of Formation, New Bylaws and New Articles of Association (as applicable), among other things, shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, the New Tower Companies and the Reorganized Debtors may amend and restate their New Certificates of Formation, New Bylaws and/or New Articles of Association (as applicable), as permitted under applicable laws, subject to the terms and conditions of such documents.

**7.12.    Employment, Retirement, Indemnification, and Other Related Agreements.**  On the Effective Date, the New Boards of the Reorganized Debtors and the New Tower Companies shall, automatically and without further action on the part of the New Boards of the Reorganized Debtors, be authorized and directed to take any and all actions necessary and appropriate to perform under the Executive Management Contracts, as modified by the Bonus Term Sheet, and any other employment agreements assumed by the Debtors, as provided herein.  On the Effective Date, the Management Incentive Plan, the Key Senior Employee Incentive Plan, the Key Employee Incentive Plan, and the bonus arrangements effectuated by the Bonus Term Sheet and the definitive documents evidencing same, shall, automatically and without further action on the part of the New Boards of the Reorganized Debtors, be deemed to be adopted by the Reorganized Debtors and the New Tower Companies and shall be fully operative and enforceable, and the Reorganized Debtors and the New Tower Companies, and their New Boards, shall be authorized and directed to take any and all actions necessary and appropriate to implement and perform under these Plans and agreements.

On and after the Effective Date, except as set forth above, the Reorganized Debtors shall have the authority, as determined by the New Boards, to: (i) maintain, amend, or revise existing employment, retirement, welfare, incentive, severance, indemnification, and other agreements with its active and retired directors or managers, officers, and employees, subject to the terms and conditions of any such agreement, and to continue to maintain and provide benefits, including all post-employment benefits, in connection therewith; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification, and other agreements for active and retired employees.

**7.13.    Effectuating Documents; Further Transactions.**  On and after the Effective Date, the New Tower Companies and the Reorganized Debtors, and the officers and members of the New Boards, are authorized to and may, in the name of and on behalf of the New Tower Companies and the applicable Reorganized Debtors, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such

actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**7.14.    Entity Action.**  Upon the Effective Date, all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to: (i) the assumption of the Executive Management Contracts (as modified by the Bonus Term Sheet), (ii) the selection of the directors and officers for the New Tower Companies and the Reorganized Debtors; (iii) the distribution of the Equityco Shares and Equityco Warrants in accordance with the Plan; (iv) the execution and entry into the Additional Facility and the New Facilities Agreements and related transaction security agreements and any other ancillary agreements relating thereto; (v) the adoption of the Management Incentive Plan (and the issuance of any Management Instruments thereunder), the Key Senior Employee Incentive Plan, and the Key Employee Incentive Plan; and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the entity structure of the Debtors, the Reorganized Debtors or the New Tower Companies, and any entity action required by the Debtors, the Reorganized Debtors or the New Tower Companies in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or the New Tower Companies.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the New Tower Companies, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors or the New Tower Companies, including the Additional Facility, New Facilities Agreements, New ICA, Shareholder Agreement, the Management Incentive Plan, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.  The issuance of the Equityco Shares and Equityco Warrants, and the issuance pursuant to the Management Incentive Plan of any other Interests in Equityco, shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of securities by an officer or director (or a director deputized for purposes thereof) as of the new Effective Date.

**7.15.    Section 1146 Exemption.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**7.16.    Preservation of Causes of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence

and pursue, as appropriate, any and all Causes of Action (other than Avoidance Actions), whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action (other than Avoidance Actions) shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action (other than Avoidance Actions) against such Person. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action (other than Avoidance Actions) against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action (other than Avoidance Actions) that a Debtor may hold against any Person shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

7.17. **Nonoccurrence of Effective Date.** In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**VIII.**
**METHOD OF DISTRIBUTIONS UNDER THE PLAN AND CLAIMS**
**RECONCILIATION**

8.1. **Distributions.** The Disbursing Agent shall make or cause to be made, in accordance with the Disbursing Agent Agreement, the Distributions required under the Plan to all Holders of Allowed Claims. The Disbursing agent for each Class of Claims shall be named in the Plan Supplement. The Disbursing Agent under the Disbursing Agent Agreement shall be the Disbursing Agent for Allowed Class 2, 3, 4 and 5 Claims. On behalf of Holders of Allowed Class 2 Claims and in accordance with the Implementation Memorandum, the Disbursing Agent

under the Disbursing Agent Agreement shall receive Cash and hold it in escrow for the purpose of making distributions to Holders of Allowed Class 2 Claims that have not made the Senior Lender Election and, pursuant to the Class 2 Option A Distribution Procedures and Class 2 Option B Distribution Procedures, as applicable, distribute such Cash Distributions and exercise call options obligating Equityco to issue Equityco Shares to the Holders of Allowed Class 2 Claims entitled to received such Cash and Equityco Shares. In accordance with the Implementation Memorandum and the Disbursing Agent Agreement, following satisfaction of the applicable Distribution Procedures and upon notification from the Debtors or the Disbursing Agent of such compliance , the New Senior Facility Agent and the New Junior Facility Agent will issue to complying Holders of Allowed Class 2 Claims the New Senior Debt and New Junior Debt, as applicable. Also in accordance with the Implementation Memorandum and the Disbursing Agent Agreement, following satisfaction of the applicable Distribution Procedures and upon notification from the Debtors or the Disbursing Agent of such compliance, Equityco shall distribute the Equityco Class 3 Warrants and Equityco Class 4 Warrants to the Holders of Allowed Class 3 and Class 4 Claims entitled to received such Equityco Class 3 Warrants and Equityco Class 4 Warrants.

**8.2.** **Actions by Disbursing Agent for Class 2, Class 3, Class 4 and Class 5 Claims.** The Disbursing Agent under the Disbursing Agent Agreement will be named in the Plan Supplement, and will be an entity that is acceptable to the Requisite Senior Lenders (acting reasonably). The Disbursing Agent for Class 2, Class 3, Class 4, and Class 5 Claims shall be authorized, empowered, and directed to take and, pursuant to the provisions of the Disbursing Agent Agreement, shall take the actions set forth in the Disbursing Agent Agreement to effectuate the transfer and assignment of the Non-Restructured Lender Claims pursuant to the Non-Restructured Lender Claim Assignment Agreement and the Distributions with respect to any Claimant in Class 2, Class 3 and Class 4, all without the need for further court authorization or specific direction or instruction from any Person, including, but not limited to, any Claimant in Class 2, Class 3, Class 4, or Class 5, except as specifically required in the Disbursing Agent Agreement or to comply with the Distribution Procedures.

**8.3.** **Disbursing Agent Agreement.** The Disbursing Agent Agreement, including any indemnification provisions set forth therein, and the rights and obligations of the Disbursing Agent thereunder, shall be ratified and approved pursuant to the provisions of the Confirmation Order. The Confirmation Order shall specifically assign the Non-Restructured Lender Claims to the Disbursing Agent under the Disbursing Agent Agreement and, thereafter, from the Disbursing Agent to Holdco, and shall authorize and direct such Disbursing Agent to enter into and execute the Non-Restructured Lender Claim Assignment Agreement and any and all other documents necessary under the laws of The Netherlands to effectuate such assignment.

**8.4.** **Distribution Record Date.** For purposes of the Plan, as of 5:00 p.m. prevailing U.S. Eastern Time on the Distribution Record Date, the records of ownership of Claims against the Debtors (including the claims register in the Chapter 11 Cases) will be closed. For purposes of the Plan, the Debtors, the Estates, the Reorganized Debtors and the Disbursing Agent shall have no obligation to recognize the transfer of any of the Claims against the Debtors occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

**8.5. Cash Payments.** Any Cash payments made pursuant to the Plan will be made in U.S. dollars. Cash payments made pursuant to the Plan in the form of a check shall be null and void if not cashed within 180 days of the date of issuance thereof.

**8.6. Delivery of Distributions.** If the Distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such Holder. Undeliverable Distributions shall be held by the Disbursing Agent subject to Section 8.9.

**8.7. Minimum Cash Distributions.** No Cash payment less than twenty-five dollars shall be made to any Holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

**8.8. Withholding Taxes.**

**8.8.1.** The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

**8.8.2.** Persons entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

**8.8.3.** Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the ballots in these Chapter 11 Cases) to obtain such information, may be deemed to have forfeited such Person's right to such distributions, which shall be treated as unclaimed property under Section 8.9.

**8.9. Unclaimed Property.** Any Person that fails to claim any Distribution to be distributed hereunder (including but not limited to, by failure to comply with the Distribution Procedures applicable to the relevant Distribution) by the Forfeiture Date will forfeit all rights to any Distributions hereunder, and shall have no claim whatsoever with respect thereto against the New Tower Companies, the Debtors or the Reorganized Debtors, their Estates, the Disbursing Agent, or any Holder of an Allowed Claim to which distributions are made. Upon the forfeiture of Cash, such Cash shall be the property of Almatis B.V., or such other entity as Equityco may direct, in writing; upon the forfeiture of the right to Distributions of New Senior Debt, New Junior Debt, or any Equityco Equity Interests, such Distributions shall, unless otherwise directed by Equityco, in writing, be cancelled. Nothing herein shall require further efforts to attempt to locate or notify any Person with respect to any forfeited property.

**8.10. Disputed Claims.** If the Debtors or any other party in interest disputes any Claim against the Debtors, such dispute shall be (a) adjudicated in the Bankruptcy Court or in any other court having jurisdiction over such dispute, or (b) settled or compromised without any further notice to or action, order, or approval by the Bankruptcy Court, as the case may be, under

applicable law.  Among other things, the Debtors (on or before the Effective Date), or the Reorganized Debtors (after the Effective Date) may each elect, at their respective sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtors.

**8.11.    Objections to Claims.**  Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; *provided*, *however*, that no such objection may be filed with respect to any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim.  The failure by any party in interest, including the Debtors and the Committee, if any, to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim in whole or in part.  After the Effective Date, no party in interest shall have the right to object to Claims against the Debtors or their Estates other than the Reorganized Debtors.

**8.12.    Compromises and Settlements.**  From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors may compromise and settle all Claims and Causes of Action, without any further approval of the Bankruptcy Court.

**8.13.    Reservation of Debtors' Rights.**  Prior to the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or other claims they may have against other Persons.

**8.14.    No Distributions Pending Allowance.**  If a Claim or any portion of a Claim is disputed, no payment or Distribution will be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such disputed claim or portion thereof becomes an Allowed Claim.

**8.15.    No Postpetition Interest on Claims.**  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**8.16.    Claims Paid or Payable by Third Parties.**

**8.16.1.    Claims Paid by Third Parties.**  The Disbursing Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Disbursing Agent.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.  The failure of such Holder to timely repay or return such

Distribution shall result in the Holder owing the Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

**8.16.2. Amounts Received From German Escrows by Holders of Class 2 Claims Making the Senior Lender Election.** The Disbursing Agent shall not make or cause to be made any Distribution to a Holder of a Class 2 Claim that makes the Senior Lender Election if, from and after the Petition Date, such Holder has received any payment on account of its Claim from the German Escrows, unless such Holder first returns such payment to the Disbursing Agent.

**8.17. Effect of Acceptance of Distribution.** Acceptance of any Distribution or other property under the Plan will constitute the recipient's acknowledgement and agreement that all Claims, demands, liabilities, other debts against, or Interests in, the Debtors (other than those created by the Plan) have been discharged and enjoined in accordance with Article IX of the Plan.

## IX.
## EFFECT OF CONFIRMATION OF PLAN

**9.1. Discharge.**

**9.1.1. Discharge of Claims Against the Debtors and the Reorganized Debtors.** Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors, the Reorganized Debtors or any of its or their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

**9.1.2. Injunction Related to the Discharge.** Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or any Interest in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting, or recovering in any

manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (v) transferring or purporting to transfer, in whole or in part or any interest in, or asserting in any case, proceeding, or court in any jurisdiction, any Senior Lender Claims, Second Lien Claims, Mezzanine Claims or Junior Mezzanine Claims; and (vi) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtors, the Reorganized Debtors, and any of their Assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

### 9.2. Releases.

**9.2.1. Releases by the Debtors.** As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacity and as debtors in possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**9.2.2. Certain Waivers.** Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, each Debtor hereby understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtors. Section 1542 of the California Civil Code provides:

**§1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

**EACH DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND EACH DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, EACH DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

**9.2.3. Releases by Holders of Claims and Interests.  For good and valuable consideration, on and after the Effective Date, Option B Releasors, and Holders of Claims that (a) vote to accept or reject the Plan and (b) do not elect (as permitted on the Ballots) to opt out of the releases contained in this paragraph, shall be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set**

**forth above does not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**9.2.4. Exculpation.** On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Debtors, the Estates, the Senior Agent, the Security Trustee and the Issuing Bank, the Senior Lenders, and the DIP Lenders, and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action or liabilities that the Debtors, the Estates, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases.

**9.2.5. Injunction Related to Releases and Exculpation.** To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to Sections 9.2.1, 9.2.2, 9.2.3, and 9.2.4 are permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities: (i) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including any such actions arising from or related to the Senior Credit Agreement, the Swap Agreements, the Mezzanine Credit Agreement or the Junior Mezzanine Credit Agreement; (iii) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including any such Lien or encumbrance arising from or related to the Senior Credit Agreement, the Swap

Agreements, the Mezzanine Credit Agreement or the Junior Mezzanine Credit Agreement; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (v) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

**9.3.    No Successor Liability.**  Except as otherwise expressly provided herein, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character. The Released Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

**9.4.    Release of Liens.**  Except (a) the prepetition Lien of the Security Trustee with respect to the Interests in Almatis B.V. and (b) as otherwise expressly provided in the Plan, the Confirmation Order will release any and all prepetition Liens against the Debtors, the Reorganized Debtors and any of their Assets.

**9.5.    Assignment of Claims.**  The Confirmation Order shall provide that, on or prior to the Effective Date, certain of the Non-Restructured Lender Claims shall be assigned and transferred to the Disbursing Agent and by the Disbursing Agent to Holdco, automatically and without the need for further action, and shall authorize the Disbursing Agent under the Disbursing Agent Agreement to execute the Non-Restructured Lender Claim Assignment Agreement to document and evidence this assignment and transfer under the laws of The Netherlands.

**9.6.    Release of German Escrows.**  The Confirmation Order shall provide that, on or prior to the Effective Date, the German Escrow Trustee shall distribute to the Trustor under the German Escrow Agreements one hundred percent (100%) of any and all assets then remaining in the German Escrows, and the Reorganized Debtors shall be authorized to provide the German Escrow Trustee with such indemnities, if any, as may be required pursuant to the German Escrows relative to such distribution. All German Escrow Agreements, including any indemnity provisions thereof, between the Debtors and the German Escrow Trustee shall, unless assumed by prior court order, be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute the court order, if any, required for the release of the German Escrows under the German Escrow Agreements.

**9.7.    Term of Injunctions.**  All injunctions or stays provided in, or in connection with, the Chapter 11 Cases, whether pursuant to section 105, section 362, or any other provision of the

Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Effective Date and shall remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order or by their own terms. In addition, the Confirmation Order shall incorporate various release, injunction, discharge and exculpation provisions Plan which shall be in effect after the Effective Date and, on and after Confirmation Date, the Debtors may seek further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

**9.8. Binding Effect.** The Plan shall be binding upon, and inure to the benefit of, the Debtors and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

**9.9. Dissolution of the Committee.** The Committee, if appointed, shall be dissolved on the Effective Date and shall not continue to exist thereafter except for the limited purposes of filing any remaining fee applications, and the Professionals retained by the Committee shall be entitled to compensation for services performed and reimbursement of expenses incurred in connection therewith. Upon dissolution of the Committee, the members of the Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases.

**9.10. Post-Confirmation Date Retention of Professionals.** After the Confirmation Date, any requirement that Professionals employed by the Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

**9.11. Indemnification of Security Trustee.** The Debtors shall indemnify the Security Trustee and the Senior Agent in accordance with the indemnification provisions set forth in section 4.A. of the Plan Support Agreement *mutatis mutandis* in connection with the Plan Support Agreement, the Plan, and the transactions contemplated by the Plan Support Agreement, the Plan, the Plan Documents, the Plan Supplement, and any document related thereto.

**9.12. Survival of Certain Indemnification Obligations.** The obligations of the Debtors, pursuant to the Debtors' operating agreements, certificates of incorporation or formation, articles of association, by-laws, or equivalent corporate governance documents, applicable statutes, or employment agreements, to indemnify individuals who prior to the Effective Date served as their respective directors, officers, managers, agents, employees, representatives, and Professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and Professionals, based upon any act or omission related to service with, for, or on behalf of the Debtors on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be

performed and honored by the Reorganized Debtors regardless of such confirmation, consummation, and reorganization.

# X.
# EFFECTIVENESS OF THE PLAN

**10.1. Conditions Precedent.** The Plan shall not become effective unless and until the following conditions have been satisfied or waived:

### 10.1.1. Conditions to Confirmation.

10.1.1.1. *Plan Supplement.* All documents to be provided in the Plan Supplement are in a form that is acceptable in all material respects to the Debtors and the Requisite Senior Lenders (acting reasonably).

10.1.1.2. *Confirmation Order.* The Confirmation Order must be entered by the Bankruptcy Court in a form acceptable in all material respects to the Debtors and the Requisite Senior Lenders (acting reasonably) and must provide for the confirmation of the Plan with respect to (a) each Debtor or (b) each Debtor other than DIC Almatis Bidco B.V..

10.1.1.3. *Available Cash.* No event or circumstance shall have occurred that, alone or in combination with any other events or circumstances, would be reasonably likely to result in less than $25,000,000 of Available Cash as of the Available Cash Calculation Date.

### 10.1.2. Conditions to Effective Date.

10.1.2.1. *Confirmation Order.* The Bankruptcy Court shall have entered the Confirmation Order in a form acceptable in all material respects to the Debtors and the Requisite Senior Lenders (acting reasonably).

10.1.2.2. *No Stay of Confirmation.* There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

10.1.2.3. *Receipt of Required Authorization.* All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

10.1.2.4. *Additional Facility.* If it is to be implemented on the Effective Date, the documents evidencing the Additional Facility shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of such document shall have been satisfied or waived.

10.1.2.5. *New Facilities Agreements.* The documents evidencing the New Facilities Agreements shall have been executed and delivered by the respective parties

thereto (other than the Senior Lenders), and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

10.1.2.6.    *Non-Tax Liabilities.*  Excluding liabilities (i) related to taxes (including Restructuring Taxes), (ii) of DIC Almatis Bidco B.V., or (iii) related to, arising from or in connection with the Restructuring, the liabilities, whether fixed, contingent, disputed, undisputed, known, liquidated, unliquidated or otherwise, of the Debtors prior to the filing of the Chapter 11 Cases shall not exceed, in aggregate, by more than $20,000,000 those liabilities of which Oaktree had actual knowledge as of March 9, 2010;

10.1.2.7.    *Tax Liabilities.*  Restructuring Taxes shall not exceed an aggregate amount of $15,000,000.

10.1.2.8.    *Available Cash.*  Available Cash on the Available Cash Calculation Date shall not have been less than $25,000,000.

10.1.2.9.    *Plan Supplement.*  All documents to be contained in the Plan Supplement shall be completed and in final form acceptable in all material respects to the Debtors and the Requisite Senior Lenders (acting reasonably) and, to the extent necessary, shall have been executed and delivered by the respective parties thereto.

10.1.2.10.    *Implementation Transactions.*  The transactions described in the Implementation Memorandum that are required to be completed on or before the Effective Date have been completed in a manner acceptable in all material respects to the Debtors and the Requisite Senior Lenders (acting reasonably).

10.1.2.11.    *German Restructuring Opinion.*  The German Restructuring Opinion shall have been delivered to the New Senior Facility Agent and the New Junior Facility Agent, as provided in the New Facilities Agreements, the Requisite Senior Lenders and Oaktree, and shall be a positive opinion that is satisfactory in form and substance to the Requisite Senior Lenders.

**10.1.3. Waiver.**  Any of the conditions set forth in Sections 10.1.1 and 10.1.2 hereof may be waived by the Debtors to the extent that such waiver does not affect the distributions hereunder; *provided*, *however*, with respect to any of the conditions set forth in Sections 10.1.1.2, 10.1.1.2, 10.1.2.1, 10.1.2.3, 10.1.2.4, 10.1.2.5, 10.1.2.9, 10.1.2.10 or 10.1.2.11, any such conditions may be waived only with the prior written consent of the Requisite Senior Lenders; *provided further*, *however*, with respect to any of the conditions set forth in Sections 10.1.1.3, 10.1.2.6, 10.1.2.7, or 10.1.2.8, any such conditions may be waived only with the prior written consent of Oaktree.

**10.2.    Effect of Failure of Conditions.**  In the event that the conditions specified in Section 10.1 have not been satisfied or waived in accordance with Section 10.1.3 hereof on or before 120 days after the Confirmation Date, then, the Debtors may seek an order from the Bankruptcy Court vacating the Confirmation Order.  Such request shall be served upon counsel for the agent under the Senior Credit Agreement, the administrative agent under the DIP Facility, the New Senior Facility Agent, the New Junior Facility Agent, the Committee, and the U.S. Trustee.  If the Confirmation Order is vacated, (i) the Plan shall be null and void in all respects;

(ii) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (iii) the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

## XI.
## RETENTION OF JURISDICTION

**11.1.    Bankruptcy Court.** Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

**11.1.1.** allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

**11.1.2.** hear and rule upon all Causes of Action retained by the Debtors and commenced and/or pursued by the Debtors or the Reorganized Debtors;

**11.1.3.** resolve any matters related to: (a) the rejection, assumption, or assumption and assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (c) any dispute regarding whether a contract or lease is or was executory or expired;

**11.1.4.** ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**11.1.5.** decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

**11.1.6.** adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**11.1.7.** enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

**11.1.8.** enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

**11.1.9.** resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

**11.1.10.** approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

**11.1.11.** hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors, or the Reorganized Debtors, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the fees and expenses of the Debtors incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

**11.1.12.** issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

**11.1.13.** hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**11.1.14.** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

**11.1.15.** determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

**11.1.16.** enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

**11.1.17.** hear and determine all matters related to (i) the property of the Debtors and the Estates from and after the Confirmation Date and (ii) the activities of the Debtors or the Reorganized Debtors;

**11.1.18.** enter an order or final decree concluding or closing the Chapter 11 Cases; and

**11.1.19.** hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## XII.
## MISCELLANEOUS PROVISIONS

**12.1. Plan Supplement.** No later than 10 days prior to the Confirmation Hearing, the Debtors shall File with the Bankruptcy Court the Plan Supplement, which shall contain such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Balloting and Claims Agent.

**12.2. Exemption for Registration Requirements.** Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and Distribution of any securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. In addition, any securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the transferability of such securities and instruments.

**12.3. Statutory Fees.** All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

**12.4. Third Party Agreements.** The Distributions to the various Classes of Claims and Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan. Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. For the avoidance of doubt, the Intercreditor Agreement shall be enforced in accordance with the Plan in favor of the Senior Lenders, except as specifically provided in the Plan with respect to the Distributions to Class 3 and Class 4 Claimants.

**12.5. Amendment or Modification of Plan.** As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before Confirmation, *provided,* that, to the extent any such modification would require the consent of the Requisite Senior Lenders or the Supporting Senior Prepetition Lenders (or some subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not obtained, such Requisite Senior Lenders or Supporting Senior Prepetition Lenders (or the appropriate subset thereof), as applicable, may revoke their vote in favor of the Plan, as modified, and *provided further*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with

section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after Confirmation and before consummation of the Plan, *provided,* that, to the extent any such modification would require the consent of the Requisite Senior Lenders or the Supporting Senior Prepetition Lenders (or some subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not obtained, such Requisite Senior Lenders or Supporting Senior Prepetition Lenders (or some subset thereof), as applicable, may revoke their vote in favor of the Plan, as modified, and *provided further*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. Except as specifically provided herein, a Holder of a Claim that has accepted the Plan prior to modification shall be deemed to have accepted such Plan as modified, *provided*, that the Plan, as modified, does not materially and adversely change the treatment of the Claim or Interest of such Holder.

**12.6. Severability.** In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, the Reorganized Debtors may, at their option, (a) treat such provision as invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void, or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan, *provided,* that, to the extent the treatment of such provision as invalid, void or unenforceable would require the consent of the Requisite Senior Lenders (or some subset thereof) or the Supporting Senior Prepetition Lenders, acting reasonably, under the Plan Support Agreement and such consent is not obtained, such Requisite Senior Lenders (or the appropriate subset thereof) or Supporting Senior Prepetition Lenders, as applicable, may revoke their vote in favor of the Plan, as modified, or (b) amend or modify, in accordance with subsection 12.5 above, or revoke or withdraw the Plan, in accordance with subsection 12.7 below.

**12.7. Revocation or Withdrawal of Plan.** The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or Interests in, such Debtors or any other Person, (B) prejudice in any manner the rights of such Debtors or any other Person, or (C) constitute an admission of any sort by the Debtors or any other Person.

For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

**12.8. Rules Governing Conflicts Between Documents.** In the event of a conflict between the terms or provisions of the Plan and any Plan Documents other than the Plan, the

terms of the Plan shall control over such Plan Documents. In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.

**12.9. Governing Law.** Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

**12.10. Notices.** Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, charges prepaid. If to the Debtors, any such notice shall be directed to the following at the addresses set forth below:

Almatis B.V.
Theemsweg 30
3197 KM Botlek
Rotterdam
The Netherlands
Attention: Mr. Remco de Jong

-- with copies to –

Almatis GmbH
Lyoner Strasse 9
60528 Frankfurt am Main
Germany
Attention: Dr. Jesko Kornemann


Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
Attention: Michael A. Rosenthal, Esq.
        Janet M. Weiss, Esq.

Linklaters LLP
One Silk Street
London
EC2Y, 8HQ
Great Britain
Attention: Robert Elliott, Esq.
        Bruce Bell, Esq.
        Michal Hlásek, Esq.

**12.11. Interest and Attorneys' Fees.** Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

**12.12. Binding Effect.** The Plan shall be binding upon the Debtors, the Reorganized Debtors, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**12.13. No Admissions.** As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, the Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations. The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors or any of their subsidiaries and Affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

**12.14. Exhibits.** All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

*-- The remainder of this page has been intentionally left blank --*

The undersigned have executed this Joint Plan of Reorganization as of the 23rd day of April, 2010.

Dated:  April 23, 2010

Respectfully submitted,

**ALMATIS B.V.**
**DIC ALMATIS BIDCO B.V.**
**ALMATIS HOLDINGS 3 B.V.**
**ALMATIS HOLDINGS 9 B.V.**
**ALMATIS HOLDINGS 7 B.V.**
**ALMATIS US HOLDING, INC.**
**ALMATIS, INC.**
**ALMATIS ASSET HOLDINGS, LLC**
**BLITZ F07-NEUNHUNDERTSECHZIG-DREI GMBH**
**ALMATIS HOLDINGS GMBH**
**ALMATIS GMBH**

**AS DEBTORS AND DEBTORS IN POSSESSION**

By: _____
      Name:  Remco De Jong
      Title:    Chief Executive Officer


OF COUNSEL:

_____
GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (MR-7006)
Janet M. Weiss (JW-5460)
Matthew K. Kelsey (MK-3137)

200 Park Ave
New York, NY 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035


PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

100715877

<u>**APPENDIX A**</u>

**to**

**The Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code, dated April 23, 2010,**

**proposed by**

**ALMATIS B.V.,
DIC ALMATIS BIDCO B.V., ALMATIS HOLDINGS 3 B.V.,
ALMATIS HOLDINGS 9 B.V., ALMATIS HOLDINGS 7 B.V.,
ALMATIS US HOLDING, INC., ALMATIS, INC., ALMATIS ASSET HOLDINGS, LLC,
BLITZ F07-NEUNHUNDERTSECHZIG-DREI GMBH, ALMATIS HOLDINGS GMBH,
AND ALMATIS GMBH**

# Uniform Glossary of Defined Terms for Plan Documents

Unless the context otherwise requires, the following terms, when used in initially capitalized form in the Disclosure Statement, related exhibits, and Plan Documents, shall have the following meanings. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined herein but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term by the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the event of a conflict or ambiguity). Certain defined terms used in only one Section of the Disclosure Statement are defined in such Section. The rules of construction set forth herein and in section 102 of the Bankruptcy Code shall apply. All references to the "***Plan***" shall be construed, where applicable, to include references to the Plan and all its exhibits, appendices, schedules, and annexes (and any amendments made in accordance with their terms or applicable law).

1. ***Additional Facility*** means a revolving credit facility, made available to certain of the Debtors, under the terms of the New SFA of up to US$25 million, the principal terms of which are set forth in the Debt Term Sheet. To the extent the Additional Facility is intended to be implemented on the Effective Date, the Additional Facility shall be substantially in the form filed in the Plan Supplement. The Additional Facility, if and when implemented, shall be a secured revolving credit facility ranking senior to the New Junior Debt and *pari passu* with the New Senior Debt.

2. ***Administrative Expense*** means any cost or expense of administration of the Chapter 11 Cases incurred before the Effective Date and allowable under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code including: (i) any actual and necessary postpetition cost or expense of preserving the Estates or operating the businesses of the Debtors; (ii) any payment required to cure a default on an assumed executory contract or unexpired lease; (iii) any postpetition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by a Debtor in the ordinary course of its business; (iv) compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code; and (v) Claims of the type identified in section 6.5 of the Form of Cash Collateral Order attached as Annex E to the Plan Support Agreement.

3. ***Administrative Expense Claim*** means any Claim for the payment of an Administrative Expense.

4. ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

5. ***Allowed*** means with respect to any Claim, except as otherwise provided herein: (i) a Claim that is scheduled by the Debtors on their Schedules as neither disputed, contingent, nor unliquidated, and as to which the Debtors or other party in interest have not Filed an objection by the Claims Objection Bar Date; (ii) a Claim that either is not a Disputed Claim or has been Allowed by a Final Order; (iii) a Claim that is

Allowed (a) pursuant to the Plan, (b) in any stipulation that is approved by the Bankruptcy Court, or (c) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan; (iv) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (a) is not a Disputed Claim or (b) has been Allowed by Final Order; or (v) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been filed by the Claims Objection Bar Date.

6. ***Allowed Amount*** of any Claim or Interest means the amount at which that Claim or Interest is Allowed.

7. ***Allowed Claim; Allowed Interest*** means any Claim or Interest in any of the Debtors or their respective Estates, as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise seek recovery from the Holder of the Claim or Interest, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.

8. ***Almatis Group*** means the Debtors and their Affiliates.

9. ***Ancillary Lender*** means each lender under the Senior Credit Facility (or an Affiliate of such lender) who made available an Ancillary Facility (as defined in the Senior Credit Agreement) in accordance with clause 9 of the Senior Credit Agreement.

10. ***Ancillary Facility Claims*** means Claims arising under any Ancillary Facility (as defined in the Senior Credit Agreement) that was made available by any Ancillary Lender in accordance with clause 9 of the Senior Credit Agreement.

11. ***Assets*** means all property wherever located in which the Debtors hold a legal or equitable interest, including all property described in section 541 of the Bankruptcy Code and all property disclosed in the Debtors' respective Schedules and the Disclosure Statement.

12. ***Available Cash*** has the meaning ascribed to such term in the Debt Term Sheet.

13. ***Available Cash Calculation Date*** has the meaning ascribed to such term in the Debt Term Sheet.

14. ***Avoidance Actions*** means any and all actual or potential Claims to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

15. ***Ballot*** means each of the ballot forms for voting to accept or reject the Plan distributed to all Holders of Impaired Claims entitled to vote on the Plan.

16.      ***Balloting and Claims Agent*** means Epiq Bankruptcy Solutions, LLC, retained by the Debtors in the Chapter 11 Cases.

17.      ***Ballot Instructions*** means the instructions for completion of a Ballot; the Ballot Instructions applicable to a Ballot shall be distributed to a Holder concurrently with the Ballot.

18.      ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. sections 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Chapter 11 Cases.

19.      ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

20.      ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

21.      ***Bonus Term Sheet*** means the restructuring term sheet attached to the Disclosure Statement as **Exhibit I** providing for the treatment of Executive Management upon the occurrence of the Restructuring, provided, among other things, that certain performance criteria are satisfied.  Definitive documents with respect to the treatment set forth in the Bonus Term Sheet will be substantially in the form filed in the Plan Supplement or, with respect to the treatment under the Executive Management Contracts, in connection with motions to assume such Executive Management Contracts.

22.      ***Business Day*** means any day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

23.      ***Call Option Agreement*** means that certain agreement, substantially in the form filed in the Plan Supplement, which gives the Disbursing Agent the exclusive right to call for Equityco Shares on behalf of Claimants in Class 2 holding Non-Restructured Lender Claims that are entitled to receive Equityco Shares under the provisions of the Plan following satisfaction of the Class 2 Option A Distribution Procedures or Class 2 Option B Distribution Procedures, as applicable and will obligate Equityco to deliver, by Dutch law notarial deeds and by making the applicable notation on the Share Register, such Equityco Shares to such Claimants.

24.      ***Cash*** means the legal tender of the United States of America, or the Euro, as applicable.

25.      ***Cash Collateral*** has the meaning set forth in section 363(a) of the Bankruptcy Code.

26.     ***Causes of Action*** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Debtors, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

27.     ***Certificate*** means any instrument evidencing a Claim or an Interest.

28.     ***Chapter 11 Cases*** means (i) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (ii) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

29.     ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor or any Estate whether or not asserted.

30.     ***Claimant*** means the Holder of a Claim.

31.     ***Claims Objection Bar Date*** means, with respect to any Claim, the 180th day following the latest of the Effective Date, the date such Claim is Filed, and such later date as may be established from time to time by the Bankruptcy Court as the last date for filing objections to such Claims.

32.     ***Class*** means a category of Holders of Claims or Interests, as set forth in Article III of the Plan, pursuant to section 1122 of the Bankruptcy Code.

33.     ***Class 2 Option A Distribution Procedures*** means, as to any Claimant in Class 2 to the extent that such Claimant has elected for Option A or is deemed to have so elected, execution by such Claimant of the following documents:

    i.   a Ratification Letter, ratifying all acts performed by the Disbursing Agent on behalf of such Claimant, substantially in the form attached as Exhibit H to the Disbursing Agent Agreement;

    ii.  a power of attorney, substantially in the form attached as Exhibit I to the Disbursing Agent Agreement, authorizing the Dutch Representative to execute on behalf of such Claimant a Dutch law notarial deed of delivery of shares, substantially in the form attached as Exhibit J to the Disbursing Agent Agreement, between the Claimant and Equityco placing with the Claimant the Equityco Shares accruing to such Claimant under the Plan;

iii. an incumbency certificate or a confirmation statement issued by a lawyer admitted to practice under the laws of the jurisdiction governing the Claimant, which may include in-house counsel, confirming the existence and authority of the Claimant, substantially in the form attached as Exhibit Q to the Disbursing Agent Agreement;

iv. a deed of adherence binding such Claimant to the provisions of the Shareholder Agreement, which deed shall be substantially in the form attached as Exhibit K to the Disbursing Agent Agreement;

v. an accession letter binding such Claimant to the provisions of the New SFA, the New ICA, and the other finance documents related thereto, which accession letter shall be substantially in the form attached as Exhibit L to the Disbursing Agent Agreement;

vi. such information and documentation as the Debtors and the Disbursing Agent may reasonably require to ensure compliance with applicable withholding and reporting requirements, including delivery of the applicable Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9; and

vii. any other item required under the Disbursing Agent Agreement.

34. ***Class 2 Option B Distribution Procedures*** means, as to any Claimant in Class 2 that has made the Senior Lender Election, execution by such Claimant of the following documents:

i. a Ratification Letter, ratifying all acts performed by the Disbursing Agent on behalf of such Claimant, substantially in the form attached as Exhibit H to the Disbursing Agent Agreement;

ii. a power of attorney, substantially in the form attached as Exhibit L to the Disbursing Agent Agreement, authorizing the Dutch Representative to execute on behalf of such Claimant a Dutch law notarial deed of delivery of shares, substantially in the form attached as Exhibit J to the Disbursing Agent Agreement, between the Claimant and Equityco placing with the Claimant the Equityco Shares accruing to such Claimant under the Plan;

iii. an incumbency certificate or a confirmation statement issued by a lawyer admitted to practice under the laws of the jurisdiction governing the Claimant, which may include in-house counsel, confirming the existence and authority of the Claimant, substantially in the form attached as Exhibit Q to the Disbursing Agent Agreement;

iv. a deed of adherence binding such Claimant to the provisions of the Shareholder Agreement, which deed shall be substantially in the form attached as Exhibit K to the Disbursing Agent Agreement;

     v.   an accession letter binding such Claimant to the provisions of the New Subordinated Agreement, the New ICA, and the other finance documents related thereto, which accession letter shall be substantially in the form attached as Exhibit L to the Disbursing Agent Agreement;

     vi.   such information and documentation as the Debtors and the Disbursing Agent may reasonably require to ensure compliance with applicable withholding and reporting requirements, including delivery of the applicable Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9; and

     vii.   any other item required under the Disbursing Agent Agreement.

     35.    ***Class 3 Distribution Procedures*** means, as to any Claimant in Class 3, execution by such Claimant of the following documents:

     i.   a Ratification Letter, ratifying all acts performed by the Disbursing Agent on behalf of such Claimant, substantially in the form attached as Exhibit H to the Disbursing Agent Agreement;

     ii.   a warrant agreement between Equityco and the Claimant with respect to the Equityco Class 3 Warrants, substantially in the form attached as Exhibit N to the Disbursing Agent Agreement;

     iii.   such information and documentation as the Debtors and the Disbursing Agent may reasonably require to ensure compliance with applicable withholding and reporting requirements, including delivery of the applicable Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9; and

     iv.   any other item required under the Disbursing Agent Agreement.

     36.    ***Class 4 Distribution Procedures*** means, as to any Claimant in Class 4, execution by such Claimant of the following documents:

     i.   a Ratification Letter, ratifying all acts performed by the Disbursing Agent on behalf of such Claimant, substantially in the form attached as Exhibit H to the Disbursing Agent Agreement;

     ii.   a warrant agreement between Equityco and the Claimant with respect to the Equityco Class 4 Warrants, substantially in the form attached as Exhibit O to the Disbursing Agreement;

     iii.   such information and documentation as the Debtors and the Disbursing Agent may reasonably require to ensure compliance with applicable withholding and reporting requirements, including delivery of the applicable Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9; and

iv.  any other item required under the Disbursing Agent Agreement.

37.  **_Collateral_** means any property or interest in property of an Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

38.  **_Collective Bargaining Agreements_** means those certain collective bargaining agreements, or their equivalent in jurisdictions other than the United States, entered into by certain of the Debtors from time to time.

39.  **_Committee_** means the official committee of unsecured creditors for the Debtors, if any, appointed by the U.S. Trustee.

40.  **_Confirmation_**, **_Confirmation of the Plan_**, or **_Plan Confirmation_** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

41.  **_Confirmation Date_** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

42.  **_Confirmation Hearing_** means the hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

43.  **_Confirmation Objection Deadline_** means the date set by the Bankruptcy Court for the filing of objections to Confirmation of the Plan.

44.  **_Confirmation Order_** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code, approving the Disclosure Statement, and approving the Debtors' solicitation procedures.

45.  **_Corporate Structure and Governance Documents_** means the documents evidencing the corporate structure and governance applicable, including the New Articles of Association, the Shareholder Agreement, and any other agreements set forth in the Equity Term Sheet, to the New Tower Companies and the Reorganized Debtors, which definitive documents will be substantially in the form filed in the Plan Supplement.

46.  **_Creditor_** means any Person holding a Claim against a Debtor's Estate or pursuant to section 102(5) of the Bankruptcy Code against property of the Debtor that arose or is deemed to have arisen on or prior to the Petition Date.

47.  **_Cure Claim_** means a Claim based upon the Debtors' defaults under an Executory Contract or Unexpired Lease existing as of the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

48.  **_Debt Term Sheet_** means that certain term sheet, attached as **<u>Exhibit F</u>** to the Disclosure Statement, with respect to, among other things, certain of the terms and/or conditions of the New Senior Debt, the New Junior Debt and the New ICA.  The

provisions of the Debt Term Sheet will be incorporated into the definitive documents related to the New Facilities Agreements and the New ICA, which definitive documents will be substantially in the form filed in the Plan Supplement.

49. **_Debtor_** means any of the Debtors.

50. **_Debtors_** means DIC Almatis Bidco B.V., Almatis Holdings 3 B.V., Almatis Holdings 9 B.V., Almatis B.V., Almatis Holdings 7 B.V., Almatis US Holding Inc., Almatis, Inc., Almatis Asset Holdings, LLC, Blitz F07-neunhundertsechzig-drei GmbH, Almatis Holdings GmbH, and Almatis GmbH.

51. **_DIP Facility_** means the debtor in possession financing, if any, approved by the Bankruptcy Court.

52. **_DIP Facility Claims_** means those Claims arising under or as a result of the DIP Facility.

53. **_DIP Lenders_** means those certain Persons who are lenders under the DIP Facility.

54. **_Disbursing Agent_** means the Debtors, the Reorganized Debtors, the Disbursing Agent under the Disbursing Agent Agreement or such other Person or Persons identified in the Plan Supplement as the disbursing agent for the Distributions required under the Plan.

55. **_Disbursing Agent Agreement_** means that certain agreement, substantially in the form attached as **_Exhibit L_** to the Disclosure Statement, by and among the Disbursing Agent, the Dutch Foundation, the New Tower Companies, and the Debtors governing the rights and obligations of the Disbursing Agent and the Debtors with respect to Distributions to Holders of Class 2, 3, and 4 Claims under the Plan and with respect to the assignment of the Class 2, 3, 4, and 5 Claims to Holdco. The final form of the Disbursing Agent Agreement will be filed in the Plan Supplement.

56. **_Disclosure Statement_** means that certain "Disclosure Statement in Support of the Joint Prepackaged Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code," dated April 23, 2010, including all exhibits attached thereto or referenced therein, as submitted by the Debtors in a form acceptable in all material respects to the Senior Lenders (acting reasonably) pursuant to section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court in the Confirmation Order, as such Disclosure Statement may be further amended, supplemented, or modified from time to time with the further approval of the Bankruptcy Court.

57. **_Distribution_** means any distribution by the Disbursing Agent to the Holders of Allowed Claims pursuant to Article VIII of the Plan.

58. **_Distribution Date_**, when used with respect to each Claim and Interest, means the date that shall take place as soon as practicable after the later of: (i) the Effective Date, (ii) the date a Claim becomes payable pursuant to any agreement with the

Disbursing Agent, or (iii) solely with respect to Disputed Claims as of the Effective Date, no later than 30 days after the date upon which the Claim becomes an Allowed Claim.

59.     ***Distribution Procedures*** means the Class 2 Option A Distribution Procedures, the Class 2 Option B Distribution Procedures, the Class 3 Distribution Procedures, and the Class 4 Distribution Procedures, as applicable.

60.     ***Distribution Record Date*** means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be five Business Days after the Confirmation Date.

61.     ***Dutch Co-op*** means DIC Almatis Equityco Cooperatief U.A., a co-operative organized under the laws of The Netherlands.

62.     ***Dutch Foundation*** means Stichting Almatis Restructuring, the sole incorporator of Equityco.

63.     ***Dutch Foundation Equityco Shares*** means 4,500,000 Equityco Shares, each with a nominal amount of EUR0.01, issued to the Dutch Foundation upon incorporation of Equityco.

64.     ***Dutch Foundation 2*** means Stichting Almatis Liquidation, a newly formed Dutch foundation.

65.     ***Dutch Representative*** means such person as may be selected by the Disbursing Agent, in its sole discretion, to implement in The Netherlands the transactions contemplated by the Plan.

66.     ***Effective Date*** means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be after the later of (i) the date on which the Confirmation Order shall have been entered and is no longer subject to any stay; and (ii) the date on which the conditions to the Effective Date provided for in Section 10.1.2 of the Plan have been satisfied or waived.

67.     ***Equityco*** means Almatis New Equity Company N.V., a newly formed limited liability company (N.V., or naamloze vennootschap) with its corporate seat in Amsterdam to be incorporated in The Netherlands that will hold 100% of the issued shares in Holdco.

68.     ***Equityco Class 3 Warrants*** means warrants or similar instruments in Equityco that will entitle the holders thereof to 3% of the amount by which the Equity Value exceeds $325,000,000.00 on the Exercise Date.  The Equityco Class 3 Warrants will be substantially in the form filed in the Plan Supplement.

69.     ***Equityco Class 4 Warrants*** means warrants or similar instruments in Equityco that will entitle the holders thereof to 2% of the amount by which the Equity

Value of Equityco exceeds $400,000,000.00 on the Exercise Date. The Equityco Class 4 Warrants will be substantially in the form filed in the Plan Supplement.

70.    ***Equityco Direction Agreement*** means that certain agreement substantially in the form filed in the Plan Supplement, pursuant to which the Dutch Foundation agrees to adopt the requisite resolutions to permit and direct Equityco to take, and cause its subsidiaries to take, certain actions to implement the Plan.

71.    ***Equityco Equity Interests*** means, collectively, the Equityco Shares and Equityco Warrants and any other Interests in Equityco.

72.    ***Equityco Shares*** means the shares in Equityco, with such economic and governance provisions as are set forth in the Equity Term Sheet, which shares shall have a par value of €0.01 per share and shall represent one hundred percent (100%) of the equity in Equityco, subject to dilution by the Equityco Warrants and the Management Instruments.

73.    ***Equityco Warrants*** means the Equityco Class 3 Warrants and the Equityco Class 4 Warrants.

74.    ***Equity Security*** means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

75.    ***Equity Term Sheet*** means that certain term sheet providing the terms and conditions of the issuance of equity in, and the corporate governance of, the New Tower Companies and the Reorganized Debtors, which Equity Term Sheet (together with its attachments, the MIP Term Sheet and the Bonus Term Sheet) is attached as **Exhibit G** to the Disclosure Statement. The provisions of the Equity Term Sheet, including the provisions of the MIP Term Sheet and the Bonus Term Sheet, will be incorporated into the Corporate Structure and Governance Documents.

76.    ***Equity Value*** means the value of the equity of Equityco.

77.    ***Estate*** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

78.    ***Euro*** means the Euro, the single currency unit of the Participating Member States.

79.    ***Exculpated Parties*** means (i) each of the Debtors' respective officers, directors, employees (including Executive Management), Professionals, and agents, (ii) the Committee, its members, and Professionals, (iii) each of the Senior Agent, the Issuing Bank and the Security Trustee, and their respective officers, directors, employees, professionals, agents, , (iv) the Disbursing Agent and its officers, directors, employees, professionals, and agents, and (v) the Senior Lenders, any Ancillary Lender, the Issuing Bank, and the DIP Lenders, and each of their respective officers, directors, employees, professionals, and agents; along with the successors and assigns of each of the foregoing.

80.     ***Executive Management*** means Remco de Jong and Charles Herlinger.

81.     ***Executive Management Contracts*** means the employment contracts, as amended, supplemented or otherwise modified, including as provided in the Bonus Term Sheet, by and between the relevant Debtor and Remco de Jong and by and between the relevant Debtor and Charles Herlinger.

82.     ***Executory Contract*** means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

83.     ***Exercise Date*** means the date on which there is (i) a direct or indirect sale of the Equityco Shares or the shares of any subsidiary of Equityco which results in the Initial Investors having an aggregate interest in Equityco or any subsidiary of Equityco of less than 50% of the direct or indirect economic or voting rights attached to the Equityco Shares, (ii) a listing of the Equityco Shares or any shares of a subsidiary of Equityco which results in the Initial Investors having an aggregate interest in Equityco or any subsidiary of Equityco of less than 50% of the direct or indirect economic or voting rights attached to the Equityco Shares, or (iii) a sale in one or more transactions of all or substantially all of the assets of Equityco, Holdco, or the Reorganized Debtors.

84.     ***Federal Judgment Rate*** means the federal judgment interest rate which was in effect as of the Petition Date.

85.     ***File*** or ***Filed*** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

86.     ***Final Order*** means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, reargument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

87.     ***Finance Documents*** has the meaning ascribed to such term in the Senior Credit Agreement.

88.     ***Financial Lenders*** means, collectively, the Senior Lenders, Second Lien Lenders, Mezzanine Lenders and Junior Mezzanine Lenders.

89.     ***First Lien Lenders*** means those certain Lenders (excluding Second Lien Lenders) as defined in the Senior Credit Agreement.

90.     ***First Lien Lender Claims*** means a Claim arising under the Senior Credit Facility and owed to a First Lien Lender, including, without limitation, all accrued and

unpaid interest, fees, and expenses, and other obligations owed to a First Lien Lender under the Senior Credit Facility, and any unsecured deficiency portion of such Claim, *provided*, *however*, that First Lien Lender Claims do not include any Ancillary Facility Claims, *provided further*, *however*, that First Lien Lender Claims do not include any L/C and Guarantee Claims.  The First Lien Lender Claim of a First Lien Lender that owns non-US dollar denominated loans and Claims shall be Allowed in US dollars using the exchange rate in effect on the Petition Date.

91.     ***Forfeiture Date*** means the date that is the one year anniversary of the Effective Date.

92.     ***General Unsecured Claim*** means any Claim, other than an Intercompany Claim, a Subordinated Claim or a Subordinated Lender Claim, that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code; *provided*, *however*, that General Unsecured Claims do not include the unsecured deficiency portion of any Senior Lender Claim.  A General Unsecured Claim shall be Allowed, to the extent such Claim is reflected in the books and records of the Debtors, in the amount reflected in such books and records, subject to the right of the Claimant to object to such amount in accordance with normal and customary practice; a General Unsecured Claim that is not reflected in the books and records of the Debtors shall be Allowed, except to the extent disputed by the Debtors pursuant to the dispute resolution procedures in the Plan.

93.     ***German Escrow Agreements*** means various escrow agreements entered into before the Petition Date by and between Almatis Holdings GmbH, as Trustor, and the German Escrow Trustee, as Trustee.

94.     ***German Escrows*** means the pre-petition escrows established by Almatis Holdings GmbH to demonstrate, among other things, its ability to pay certain debts when they fall due according to sec. 17 of the German Insolvency Act.

95.     ***German Escrow Trustee*** means Schultze & Braun Vermögensverwaltungs- und Treuhandgesellschaft mbH, represented by Dr. Rainer Riggert, as trustee, or any other Person serving as trustee of a German Escrow, and any successors thereto.

96.     ***German Restructuring Opinion*** means a restructuring opinion prepared according to the standards set forth by the German Institute of Chartered Accountants (Institut der Wirtschaftspruefer) in the draft publication IDW ES 6.

97.     ***Governmental Unit*** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

98.     ***Hedge Counterparties*** means those certain Hedge Counterparties as defined in the Senior Credit Facility and the Intercreditor Agreement.

99.    ***Hedge Counterparty Claim*** means a Claim arising under the relevant Swap Agreement and owed to any of the Hedge Counterparties, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to any of the Hedge Counterparties under the relevant Swap Agreement, and any unsecured deficiency portion of such Claim.  The Hedge Counterparty Claim of any of the Hedge Counterparties that owns non-US dollar denominated loans and Claims shall be Allowed in US dollars using the exchange rate in effect on the Petition Date.

100.    ***Holdco*** means Almatis New Holding 1 B.V., a newly formed limited liability company (besloten vennootschap met beperkte aansprakelijkheid) with its corporate seat in Amsterdam to be incorporated in The Netherlands that will hold 100% of the issued shares in Holdco 2.

101.    ***Holdco 2*** means Almatis New Holding 2 B.V., a newly formed limited liability company (besloten vennootschap met beperkte aansprakelijkheid) with its corporate seat in Amsterdam to be incorporated in The Netherlands that will by wholly owned by Holdco and own 100% of the issued shares in Almatis B.V., as a Reorganized Debtor.

102.    ***Holder*** means any Person holding an Interest or Claim.

103.    ***Impaired*** means a Claim or a Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

104.    ***Implementation Memorandum*** means the memorandum describing the restructurings, transfers, or other corporate transactions that the Debtors determine to be necessary or appropriate to effect the Restructuring in compliance with the Bankruptcy Code and applicable Dutch and German law and, to the maximum extent possible, in a tax efficient manner, and in such a manner as to have no adverse impact on the security position of the Senior Lenders and lenders under the New SFA and the New Subordinated Agreement.  A non-final form of the Implementation Memorandum is attached to the Disclosure Statement as **Exhibit J**.  The Plan Supplement will include a substantially final form of the Implementation Memorandum.

105.    ***Initial Investors*** means the legal entities nominated by the Holders of Senior Lender Claims to hold the Equityco Shares which such Holders are entitled to receive under the Plan.

106.    ***Intercompany Claim*** means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor other than any Claim of Dutch Co-op against any Debtor or any Claim of any Debtor whose Subplan is not confirmed by the Bankruptcy Court against any Debtor.

107.    ***Intercompany Claim Assignment Agreement*** means that certain agreement between Almatis Holdings 3 B.V. and Holdco 2 assigning and transferring to Holdco 2 free and clear of liens granted under or in connection with the Senior Credit Agreement, the Swap Agreements, the Mezzanine Credit Agreement, and the Junior Mezzanine Credit Agreement, all Intercompany Claims owed to Almatis Holdings 3 B.V.

by Almatis B.V. and any other subsidiary of Almatis Holdings 3 B.V. The final form of the Intercompany Claim Assignment Agreement will be filed in the Plan Supplement.

108.     ***Intercompany Contracts*** means any Executory Contract by or between or among any of the Debtors other any Executory Contract by or between or among any of the Debtors and any Debtor whose Subplan is not confirmed by the Bankruptcy Court.

109.     ***Intercompany Interests*** means the Interests held in a Debtor by another Debtor, but does not include any such Interests held by a Debtor whose Subplan is not confirmed by the Bankruptcy Court.

110.     ***Intercreditor Agreement*** means that certain intercreditor agreement, dated 31 October 2007 (as amended, restated, supplemented and/or otherwise modified) by and among, *inter alia*, DIC Almatis Midco B.V. and others, Various Creditors and UBS Limited, as Senior Agent and Security Trustee.

111.     ***Interests*** means, as to each Debtor, any: (i) Equity Security of such Debtor, including all shares or similar securities in any Debtor, whether or not transferable or denominated "stock", and whether issued, unissued, authorized, or outstanding; (ii) any warrants, options, or contractual rights to purchase, sell, subscribe or acquire such Equity Security at any time and all rights arising with respect thereto; and (iii) any similar interest in a Debtor.  For the avoidance of doubt, Interests includes any and all rights of ownership of whatever kind or nature in any Debtor that is organized under the laws of the Federal Republic of Germany or The Netherlands.

112.     ***Issuing Bank*** means UBS Limited and any lender under the Senior Credit Agreement which has notified the Senior Agent that it has agreed to DIC Almatis Bidco B.V.'s request to be an Issuing Bank pursuant to and in accordance with the terms of the Senior Credit Agreement.

113.     ***Junior Mezzanine Claim*** means a Claim arising under the Junior Mezzanine Credit Agreement and owed to a Junior Mezzanine Lender, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to a Junior Mezzanine Lender under the Junior Mezzanine Credit Agreement.  The Junior Mezzanine Claim of a Junior Mezzanine Lender that owns non-US dollar denominated loans and Claims shall be Allowed in US dollars using the exchange rate in effect on the Petition Date.  With respect to the Junior Mezzanine Claims, the Plan shall fully implement the subordination provisions of the Intercreditor Agreement in favor of Senior Lenders as provided by section 510(a) of the Bankruptcy Code.

114.     ***Junior Mezzanine Credit Agreement*** means that certain Junior Mezzanine Facility Agreement dated 11 November 2007 (as amended, restated, supplemented and/or otherwise modified) together with all Finance Documents (as defined therein), agreements, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

115.     ***Junior Mezzanine Lender*** means a Finance Party as defined under the Junior Mezzanine Credit Agreement.

116. ***KEIP Term Sheets*** means those certain term sheets attached to the Disclosure Statement as **Exhibit K**, providing the terms and conditions of the Key Employee Incentive Plan and the Key Senior Employee Incentive Plan.

117. ***Key Employee Incentive Plan*** means the restructuring incentive plan for key employees, the material terms of which are set forth in the KEIP Term Sheets. The final form of the Key Employee Incentive Plan will be filed in the Plan Supplement.

118. ***Key Senior Employee Incentive Plan*** means the restructuring incentive plan for key senior employees, the material terms of which are set forth in the KEIP Term Sheets. The final form of the Key Senior Employee Incentive Plan will be filed in the Plan Supplement.

119. ***L/C and Guarantee Claims*** means Claims arising under various letters of credit or guarantees that were issued under the Senior Credit Facility.

120. ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

121. ***Liquidation Analysis*** means the liquidation analysis attached as **Exhibit B** to the Disclosure Statement.

122. ***Management Incentive Plan*** means the post-Effective Date incentive plan for management of Equityco and its subsidiaries (including the Reorganized Debtors), the terms and conditions of which are set forth in the MIP Term Sheet. The final form of the Management Incentive Plan will be filed in the Plan Supplement.

123. ***Management Instruments*** means the equity participations to be issued to management of the Reorganized Debtors pursuant to the Management Incentive Plan.

124. ***Mezzanine Claim*** means a Claim arising under the Mezzanine Credit Agreement and owed to a Mezzanine Lender, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to a Mezzanine Lender under the Mezzanine Credit Agreement. The Mezzanine Claim of a Mezzanine Lender that owns non-US dollar denominated loans and Claims shall be Allowed in US dollars using the exchange rate in effect on the Petition Date. Except with respect to the Distributions payable to Holders of Mezzanine Claims under the Plan, the Plan shall implement the subordination provisions of the Intercreditor Agreement in favor of Senior Lenders as provided by section 510(a) of the Bankruptcy Code.

125. ***Mezzanine Credit Agreement*** means that certain Mezzanine Facility Agreement dated 31 October 2007 (as amended, restated, supplemented and/or otherwise modified) together with all Finance Documents (as defined therein), agreements, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

126. ***Mezzanine Lender*** means a Finance Party as defined in the Mezzanine Credit Agreement.

127.    ***MIP Term Sheet*** means that certain term sheet attached to the Disclosure Statement as **Exhibit H**, providing the terms and conditions of the Management Incentive Plan, including the issuance of the Management Instruments. Definitive documents evidencing the Management Incentive Plan and the Management Instruments will be substantially in the form filed in the Plan Supplement.

128.    ***New Articles of Association*** means, as to Equityco, Holdco, Holdco 2 and any Reorganized Debtor that is organized under the laws of the Netherlands, the articles of association of such entity, which articles of association shall be substantially in the form filed in the Plan Supplement.

129.    ***New Boards*** means the initial boards of directors (or their equivalents under applicable law) of the Reorganized Debtors and the New Tower Companies.

130.    ***New Bylaws*** means, as to any Reorganized Debtor that is a U.S. entity, the bylaws of such entity, and as to any Reorganized Debtor that is not a U.S. entity, any equivalent corporate governance document, which documents shall be substantially in the forms filed in the Plan Supplement.

131.    ***New Certificate of Formation*** means the form of the revised certificates of incorporation or other formation of each of the Reorganized Debtors that is not organized under the laws of the Netherlands, which New Certificates of Formation shall be substantially in the form filed in the Plan Supplement.

132.    ***New Facilities Agreements*** means the New SFA and the New Subordinated Agreement.

133.    ***New ICA*** means that certain intercreditor agreement, certain terms of which are set forth in the Debt Term Sheet, which New ICA shall be substantially in the form filed in the Plan Supplement.

134.    ***New Junior Debt*** means the junior debt governed by the New Subordinated Agreement.

135.    ***New Junior Facility Agent*** means the Facility Agent under the New Subordinated Agreement.

136.    ***New Junior Lenders*** means the parties that will hold the New Junior Debt.

137.    ***New Revolving Credit Facility Lenders*** means those Persons, if any, who have committed to provide the Additional Facility as of the Effective Date.

138.    ***New Senior Facility Agent*** means UBS Limited in its capacity as Facility Agent under the New SFA.

139.    ***New Senior Debt*** means the senior debt governed by the New SFA.

140.    ***New Senior Lenders*** means the parties that will hold the New Senior Debt.

141.    ***New SFA*** means that certain multicurrency credit agreement and related documents, the principal terms of which are set forth in the Debt Term Sheet, providing for the issuance of the New Senior Debt, which New SFA shall be substantially in the form filed in the Plan Supplement. The New SFA shall provide for a senior secured term and revolving credit loan facility ranking senior to the New Junior Debt and *pari passu* with any Additional Facility.

142.    ***New Subordinated Agreement*** means that certain multicurrency subordinated credit agreement and related documents, the principal terms of which are set forth in the Debt Term Sheet, providing for the issuance of the New Junior Debt, which New Subordinated Agreement shall be substantially in the form filed in the Plan Supplement. The New Subordinated Agreement shall provide for a junior secured term loan facility ranking junior to the New Senior Debt.

143.    ***New Tower Companies*** means Equityco, Holdco, and Holdco 2.

144.    ***Non-Restructured Lender Claims*** means (a) the Senior Lender Claims that are not restructured and continued as senior debt claims against the Reorganized Debtors pursuant to the New SFA, (b) the Second Lien Lender Claims, (c) the Mezzanine Claims and (d) the Junior Mezzanine Claims.

145.    ***Non-Restructured Lender Claim Assignment Agreement*** means that certain agreement, substantially in the form filed in the Plan Supplement, which provides for the assignment from the Disbursing Agent to Holdco of certain of the Non-Restructured Lender Claims in Classes 2(a)-(k), 3(a)-(k), 4(a)-(k), and 5(a)-(d).

146.    ***Oaktree*** means companies or investment funds owned and/or managed, directly or indirectly, by Oaktree Capital Management, L.P. that separately hold Senior Lender Claims; provided that, where the consent of, or provision or receipt of notice by, Oaktree is required for any action, the consent of, or provision or receipt of notice by, Oaktree shall mean the consent of, or provision or receipt of notice by, Pilgrim S.a.r.l.

147.    ***Option A Cash Consideration*** means, for any Holder of an Allowed Senior Lender Claim that does not make the Senior Lender Election, Cash in the amount of USD$0.065 for each USD$1.00 in nominal amount of Senior Lender Claim held by such Holder, *provided*, *however*, that if Available Cash (as defined in the Debt Term Sheet) is less than $35,000,000, (a) the Cash payable to a Holder with respect to the Option A Cash Consideration will be reduced ratably by the amount of the Available Cash Shortfall (as defined in the Debt Term Sheet) up to $10,000,000 in the aggregate, and (b) to the extent that the Cash payable with respect to the Option A Cash Consideration is reduced, as provided in clause (a) above, the Option A Cash Consideration shall be payable in New Senior Debt in an equivalent amount; *provided further*, *however,* that the amount payable to a Holder with respect to the Option A Cash Consideration, whether payable in Cash or in New Senior Debt, as the case may be, shall

be reduced dollar for dollar to the extent that such Holder has received any payments from the German Escrows from and after the Petition Date.

148.    ***Option A Consideration*** means, for any Holder of an Allowed Senior Lender Claim that does not make the Senior Lender Election, (a) New Senior Debt in a nominal amount equal to 80% of the principal amount of such Holder's Senior Lender Claim (the amount of which New Senior Debt, to the extent issued in Euros, shall be calculated using the U.S. dollar to Euro exchange rate in effect on the Petition Date) plus (b) the Option A Cash Consideration plus (c) the principal amount of such Holder's Senior Lender Claim multiplied by US$0.01 which shall be applied (using the U.S. dollar to Euro exchange rate in effect on the Petition Date) towards a subscription for Equityco Shares at par.

149.    ***Option B Consideration*** means, for any Holder of an Allowed Senior Lender Claim that makes the Senior Lender Election, (a) New Junior Debt in a nominal amount equal to 45% of the principal amount of such Holders' Senior Lender Claim (the amount of which New Junior Debt, to the extent issued in Euros, shall be calculated using the U.S. dollar to Euro exchange rate in effect on the Petition Date) plus (b) an amount equal to the principal amount of such Holder's Senior Lender Claim multiplied by US$0.075 which shall be applied (using the U.S. dollar to Euro exchange rate in effect on the Petition Date) towards a subscription for Equityco Shares at par.

150.    ***Option B Releasors*** means Holders of Senior Lender Claims who make the Senior Lender Election and vote to accept the Plan, which Holders shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Claims and Causes of Action against the Released Parties pursuant to Section 9.2.3 of the Plan.

151.    ***Other Priority Claim*** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

152.    ***Other Secured Claim*** means any Secured Claim that is not a Senior Lender Claim, a Second Lien Lender Claim, a Mezzanine Claim, or a Junior Mezzanine Claim.  For the avoidance of doubt, Ancillary Facility Claims and L/C and Guarantee Claims are Other Secured Claims.

153.    ***Participating Member States*** means any state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to economic and monetary union.

154.    ***Pension Plan*** means those pension or retirement or other post-employment benefit agreements (or their equivalent in jurisdictions other than the United States) to which the Debtors are party.

155.    ***Person*** means any person, including without limitation, any individual, entity, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, estate, trust, unincorporated association

or organization, official committee, *ad hoc* committee or group, governmental agency or political subdivision thereof, the U.S. Trustee, and any successors or assigns of any of the foregoing.

156. ***Petition Date*** means the date on which the Chapter 11 Cases were commenced with the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

157. ***Plan*** means the Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code proposed by the Debtors, dated April 23, 2010, and all exhibits attached thereto or referenced therein including, without limitation, the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; the Plan incorporates the Subplans for each Debtor.

158. ***Plan Documents*** means the Plan, the Plan Supplement, the Disclosure Statement, and all documents, attachments, and exhibits attached to the Plan or the Disclosure Statement that aid in effectuating the Plan, as the same may be amended, modified, or supplemented, in accordance with their terms.

159. ***Plan Supplement*** means the supplement to the Plan to be filed by the Debtors with the Bankruptcy Court not later than 10 days prior to the Confirmation Hearing, which supplement shall contain forms of substantially final documents required for the implementation of the Plan.

160. ***Plan Support Agreement*** means that certain Plan Support Agreement, by and among the Almatis Group (as defined therein) and the Supporting Senior Prepetition Lenders (as defined therein), executed by the Almatis Group on April 14, 2010.

161. ***Postpetition Period*** means the period of time following the Petition Date through the Confirmation Date.

162. ***Priority Tax Claim*** means a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code.

163. ***Professional Compensation Claim*** means all Administrative Expense Claims for compensation, indemnification, or reimbursement of expenses incurred by Professionals through the Confirmation Date pursuant to section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases.

164. ***Professionals*** means those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(1) of the Bankruptcy Code and/or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court or is sought pursuant to section 503(b)(4) of the Bankruptcy Code.

165.     **Proof of Claim** means any proof of claim filed with the Bankruptcy Court or the Balloting and Claims Agent with respect to a Debtor pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002.

166.     **Pro Rata Share** means, with reference to any Distribution on account of any Allowed Claim or Allowed Interest in a Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such claim bears to the aggregate amount of all Allowed Claims or Allowed Interests in the same Class.

167.     **Ratification Letter** means that certain letter to be executed by any Claimant in Classes 2 through 4, as a precondition to receiving its Distribution in the relevant Class, which Ratification Letter shall be substantially in the form attached to the Disbursing Agent Agreement and shall ratify all acts performed by the Disbursing Agent on behalf of the Claimant, including the assignment of the Non-Restructured Lender Claims by the Disbursing Agent to Holdco pursuant to the Non-Restructured Lender Claim Assignment Agreement.

168.     **Record Date** means 5:00 pm (prevailing U.S. Eastern Time) on April 6, 2010.

169.     **Rejected Executory Contract and Unexpired Lease List** means the list (as may be amended from time to time), as determined by the Debtors or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to Article VI of the Plan.

170.     **Released Parties** means (i) each of the Debtors' respective officers, directors, employees, Professionals, and agents, (ii) the Committee, its members, and Professionals, (iii) each of the Senior Agent, the Issuing Bank and the Security Trustee, and each of their respective officers, directors, employees, professionals, and agents, (iv) the Disbursing Agent and its officers, directors, employees, professionals, and agents, (v) the Senior Lenders and the DIP Lenders and each of their respective officers, directors, employees, professionals, and agents, (vi) each Ancillary Lender, and (vii) the Issuing Bank; along with the successors and assigns of each of the foregoing.

171.     **Reorganized** means, when used with reference to a Debtor, such Debtor on and after the Effective Date.

172.     **Requisite Senior Lenders** means those Senior Lenders holding two-thirds (2/3) in aggregate of the total principal amount of the Senior Lender Claims.

173.     **Restructuring** means the restructuring of the Debtors' capital structure implemented by the Plan and the transactions contemplated in connection therewith.

174.     **Restructuring Taxes** means actual or anticipated tax liabilities of the Almatis Group (other than any actual or anticipated tax liabilities of DIC Almatis Midco B.V., DIC Almatis Bidco B.V., or DIC Almatis Holdco B.V. for which no other member of the Almatis Group is or may be liable pursuant to any form of affiliated group liability,

successor liability, by contract or otherwise) resulting from the Restructuring (but only to the extent that such taxes become due and payable within the two year period following the Effective Date (as defined in the Plan)), including any actual or potential tax liabilities disclosed in the Implementation Memorandum but excluding any incremental taxes payable by a member of the Almatis Group solely as a result of: (i) the inability of the Almatis Group to utilize previously-accrued tax losses or (ii) write-downs of the tax basis of Almatis Group assets (in each of cases (i) and (ii), occurring as a result of the cancellation of indebtedness of the Almatis Group pursuant to the Restructuring). For the avoidance of doubt, (A) Restructuring Taxes shall include any tax payable consequent upon waiver or deemed waiver of debt by a member of the Almatis Group where such taxes are payable solely because waiver profits of such member are taxed because losses are deemed to be available to such member under Article 8 section 4 Dutch Corporate Income Tax Act 1969 and (B) when more than one member of the Almatis Group is or may be liable for the same Restructuring Tax pursuant to any form of affiliated group liability, successor liability, by contract or otherwise, such Restructuring Tax shall be counted and taken into consideration only once.

175. **Schedules** means the schedules, statements, and lists filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, if any, as may be amended or supplemented from time to time.

176. **Scheduling Motion** means the motion filed by the Debtors, substantially contemporaneously with the filing of the Chapter 11 Cases, satisfying the criteria set forth for a Prepack Scheduling Motion in Part III.A. of that certain General Order M-387, dated November 24, 2009, entered in the United States Bankruptcy Court for the Southern District of New York by The Honorable Stuart Bernstein and captioned *In the Matter of the Adoption of Prepackaged Chapter 11 Case Amended Guidelines, Amending General Order 203*.

177. **Scheduling Order** means the order granting the Scheduling Motion and scheduling the Confirmation Hearing.

178. **Second Lien Claim** means a Claim arising under the Senior Credit Facility and owed to a Second Lien Lender, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to a Second Lien Lender under the Senior Credit Agreement. The Second Lien Claim of a Second Lien Lender that owns non-US dollar denominated securities, shall be Allowed in US dollars using the exchange rate in effect on the Petition Date. Except with respect to the Distributions payable to Holders of Second Lien Claims under the Plan, the Plan shall implement the subordination provisions of the Intercreditor Agreement in favor of Senior Lenders as provided by section 510(a) of the Bankruptcy Code.

179. **Second Lien Lenders** means those certain Second Lien Lenders as defined in the Senior Credit Agreement.

180. **Section 510(b) Claims** means any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors,

for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

181. ***Secured*** means when referring to a Claim: (i) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law, or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (ii) Allowed as such pursuant to the Plan. For the avoidance of doubt, a Claim shall be "Secured" hereunder if such security would be recognized as valid and enforceable under applicable law of the foreign jurisdiction pursuant to which such security was created

182. ***Securities Act*** means the Securities Act of 1933, 15 U.S.C. §§ 77a-77m, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

183. ***Security Trustee*** means UBS Limited in its capacity as Security Trustee under the Intercreditor Agreement.

184. ***Senior Agent*** means UBS Limited, as facility agent for the First Lien Lenders under the Senior Credit Facility.

185. ***Senior Credit Agreement*** means that certain Senior and Second Lien Facilities Agreement, dated 31 October 2007 (as amended, supplemented, or otherwise modified), for DIC Almatis Bidco B.V. arranged by UBS Limited with UBS Limited acting as Facility Agent, the Issuing Bank, and Security Trustee.

186. ***Senior Credit Facility*** means the Senior Credit Agreement, together with all Finance Documents (as defined in the Senior Credit Agreement) and agreements, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith, which provides for certain Term Facilities, Revolving Facilities, and Ancillary Facilities (as these terms are defined in the Senior Credit Agreement).

187. ***Senior Lender Claims*** means the First Lien Lender Claims and the Hedge Counterparty Claims.

188. ***Senior Lender Election*** means the affirmative election by a Holder of Allowed Senior Lender Claims to receive, with respect to all Senior Lender Claims held by such Holder, the treatment provided in Section 4.2.3 of the Plan, in lieu of the treatment provided in Section 4.2.2 of the Plan; provided, however, that no Senior Lender Election shall be valid unless it is timely made by a Senior Lender, by exercise of the Second Lender Election on the Class 2 Ballot applicable to such Holder, with respect to all of such Holder's Allowed Senior Lender Claims against all Debtors.

189.    ***Senior Lenders*** means the First Lien Lenders and the Hedge Counterparties.

190.    ***Share Register*** means, with respect to any Person, the registry of interest holders of such Person.

191.    ***Shareholder Agreement*** means that certain agreement, to be entered into as of the Effective Date, by and among Equityco and the holders of Equityco Shares, Equityco Warrants and Management Instruments, which agreement shall be substantially in the form filed in the Plan Supplement; the principal terms of the Shareholder Agreement are set forth in the Equity Term Sheet.

192.    ***Solicitation Package*** means the package mailed to Holders of Claims entitled to vote to accept or reject the Plan, which package contains, among other things, (i) a copy of the Plan; (ii) a copy of the Disclosure Statement; (iii) a copy of the proposed Confirmation Order; (iv) the appropriate Ballot, Ballot Instructions, and Ballot return envelope; (v) a cover letter from the Debtors; and (vi) a letter in support of the Plan provided by certain Supporting Senior Prepetition Lenders (as defined in the Plan Support Agreement.

193.    ***Subordinated Claim*** means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court and that is subordinated to General Unsecured Claims, but does not include Subordinated Lender Claims.

194.    ***Subordinated Lender Claims*** means the Second Lien Claims, the Mezzanine Claims and the Junior Mezzanine Claims.

195.    ***Subplan*** means, when used in connection with a Debtor, the Plan of Reorganization under Chapter 11 of the Bankruptcy Code for such Debtor that is incorporated into the Plan.

196.    ***Supporting Senior Prepetition Lenders*** means those Holders of Senior Lender Claims who are parties to the Plan Support Agreement.

197.    ***Swap Agreements*** means that certain ISDA Master Agreement dated as of January 4, 2008, between UBS Limited and Almatis B.V., that certain ISDA Master Agreement dated as of January 4, 2008, between UBS AG, London Branch and Almatis Holdings GmbH, that certain ISDA Master Agreement dated as of January 4, 2008, between UBS AG, London Branch and Almatis US Holding Inc., that certain ISDA Master Agreement dated as of January 14, 2008, between Almatis Holdings GmbH and Commerzbank Aktiengesellschaft, and that certain ISDA Master Agreement dated as of March 20, 2008, between Almatis B.V. and Commerzbank Aktiengesellschaft.

198.    ***Unclaimed Property*** means unclaimed Cash held by the Disbursing Agent under the Disbursing Agent Agreement and any Distributions returned to or otherwise held by the Disbursing Agent on the Forfeiture Date as well as any other Distributions not claimed on the Forfeiture Date.

199.     ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

200.     ***Unimpaired*** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

201.     ***USD*** means United States Dollars, the legal tender of the United States of America.

202.     ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

203.     ***U.S. Trustee Fees*** means all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code, and interest, if any, for delinquent quarterly fees pursuant to section 3717 of title 31 of the United States Code.

204.     ***Voting Deadline*** means 5:00 p.m. (Prevailing U.S. Eastern Time) on May 7, 2010, which is the deadline for submitting Ballots.

205.     ***Voting Report*** means the report prepared by the Balloting and Claims Agent which reports the results of the tabulation of votes to accept or reject the Plan.